Salvatore LAMBERTI, Movant,

v.

UNITED STATES of America,
Respondent.

Giuseppe LAMBERTI, Movant,

v.

UNITED STATES of America,
Respondent.

Salvatore CATALANO, Movant,

v.

UNITED STATES of America,
Respondent.

Gaetano BADALAMENTI, Movant,

v.

UNITED STATES of America,
Respondent.

Nos. 95 Civ. 1557(LAK), 96 Civ.
3900(LAK), 96 Civ. 3908(LAK)
and 97 Civ. 1866(LAK).

United States District Court,
S.D. New York.

Sept. 4, 1998.

Mario Malerba, James A. Cohen, Malerba & LaSala, for Movant Salvatore Catalano.

Barry M. Fallick, Rochman, Platzer, Fallick & Sternheim, New York, NY, for Movant Giuseppi Lamberti.

Lawrence Schoenbach, New York, NY, for Movant Gaetano Badalamenti.

Salvatore Lamberti, pro se.

Patrick Fitzgerald, Jamie Kogan, Assistant United States Attorneys, Mary Jo White, for United States.

## MEMORANDUM OPINION

KAPLAN, District Judge.

In one of the largest trials this district ever has seen, known popularly as the "Pizza Connection" case, twenty-one defendants stood accused of participating in a widespread conspiracy among members of the Sicilian mafia and La Cosa Nostra in the United States to import and distribute more

than one and one-half tons of heroin and cocaine, accumulate in various pizza parlors more than one billion dollars of proceeds, and then smuggle the cash out of the country or launder it through a network of foreign bank accounts. Seventeen months of trial produced a transcript of more than 40,000 pages and resulted in numerous convictions on various of the thirty-five counts.[1] Now before this Court, more than eleven years after the guilty verdicts were entered, four of the defendants move to set aside their convictions pursuant to 28 U.S.C. § 2255.[2]

### Discussion

#### I. Claims of Gaetano Badalamenti

■ Gaetano Badalamenti attacks his convictions on six grounds:[3] that (1) the government suppressed evidence favorable to his defense regarding the allegedly exculpatory opinion of a government witness, Tomasso Buscetta, and (2) regarding Buscetta's alleged affiliation with the CIA, in violation of *Brady v. Maryland*,[4] (3) the government threatened Buscetta in order to induce him to testify more favorably to the prosecution, (4) Badalamenti received ineffective assistance of counsel at trial, (5) his sentence violated the terms of the order of extradition from Spain pursuant to which he was released into the custody of United States authorities,[5] and (6) his conviction of both narcotics conspiracy and continuing criminal enterprise counts violates the Supreme Court's holding in *Rutledge v. United States*.[6]

#### A. Alleged Suppression of Buscetta's Opinions

Gaetano Badalamenti, the former head of the Sicilian mafia, was chief among the defendants in the Pizza Connection case. Ousted from his position as the head of the Sicilian mafia commission in 1978, Badalamenti fled for his life to Brazil, from which he allegedly oversaw shipments of heroin to a distribution network located in the United States. The government's case against Badalamenti consisted primarily of tapes of intercepted telephone calls in which Badalamenti spoke with an alleged buyer in the United States regarding the shipment of "shirts," "parcels," and "containers," coupled

1. Each of the movants was found guilty of conspiracy to import and distribute narcotics. 21 U.S.C. § 846 (Count One). Movants Gaetano Badalamenti, Salvatore Catalano and Giuseppe Lamberti were found guilty of engaging in a continuing criminal enterprise, a charge on which Salvatore Lamberti was acquitted. 21 U.S.C. § 848 (Counts Two through Eleven). Catalano, Giuseppe Lamberti and Salvatore Lamberti were convicted of conspiring to conduct and participating, through a pattern of racketeering, in an enterprise which engaged in international drug trafficking and money laundering. 18 U.S.C. § 1962(d) (Count Sixteen). Catalano alone was convicted also of conspiracy to transport money out of the United States without filing required currency reports, 18 U.S.C. § 371 (Count Twelve), and failing to file required currency reports. 31 U.S.C. § 1059 (recodified at 31 U.S.C. § 5322), 1081 (recodified at 31 U.S.C. §§ 5313), 5313(a) and 5322(b), and 18 U.S.C. § 2 (Counts Fourteen and Fifteen). These convictions were affirmed on appeal. *United States v. Casamento*, 887 F.2d 1141 (2d Cir.1989), *cert. denied*, 493 U.S. 1081, 110 S.Ct. 1138, 107 L.Ed.2d 1043 (1990).

2. Judge Pierre N. Leval, the trial judge and now a member of the Second Circuit, retained the claims of Salvatore Lamberti based on ineffective assistance of counsel, inaccurate translation at trial and an inaccurate presentence report. *See*

*Lamberti v. United States*, No. 97 Civ. 4471(PNL) (erroneously denominated 95 Civ. 1557; *see* Order, July 24, 1997), 1998 WL 118172 (S.D.N.Y. Mar.13, 1998). The remainder of the claims were reassigned to the undersigned. Order of Judge Leval, June 10, 1997.

3. Badalamenti moved on January 17, 1996 for a new trial pursuant to FED. R.CRIM. P. 33. By order dated January 8, 1997, Judge Leval ordered that the Rule 33 motion be converted to a Section 2255 motion *nunc pro tunc* to January 17, 1996.

4. 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

5. Badalamenti's claim that his sentence violates the terms of the extradition order was withdrawn pending an anticipated receipt of a protest from the government of Spain. As the Court has received no indication that such a protest ever was received or is forthcoming, the Court treats that claim as having been voluntarily withdrawn. Additionally, the Court notes that the issue appears to have been raised on direct appeal, *Casamento*, 887 F.2d at 1185, and therefore is not properly addressed in this collateral attack.

6. 517 U.S. 292, 116 S.Ct. 1241, 134 L.Ed.2d 419 (1996).

with evidence tending to demonstrate receipt by Badalamenti's acknowledged subordinates of two shipments of narcotics in April 1983 and February 1984.[7] Central to the government's case was interpretation of Badalamenti's cryptic references contained on the tapes of the phone calls.

Leading off the trial for the government was Tomasso Buscetta, a self-confessed high-level Sicilian mafioso turned informer. In addition to detailing the structure of the Sicilian mafia and its rules and regulations, Buscetta identified voices heard on the intercepted phone calls and, on cross-examination, testified as to his beliefs regarding Badalamenti's involvement or lack thereof in drug trafficking. Specifically, Buscetta stated that Badalamenti "was not against and he did not deal in drugs."[8] When asked whether he ever had heard Badalamenti speak out about drug trafficking, Buscetta stated that "[w]e were too concerned about other things to speak about drugs. I was certain that he was not working in drugs."[9] On redirect, however, Buscetta clarified his earlier testimony by stating that his opinion of Badalamenti's lack of involvement in narcotics had been based only on the period up to 1982, referred only to heroin and not cocaine, and had been premised on his knowledge that Badalamenti had been expelled from the Sicilian mafia and Buscetta's belief that mafia connections were essential to narcotics trafficking.[10]

Badalamenti now claims that the government knew, but failed to disclose, that Buscetta held two opinions that Badalamenti believes would have exculpated him and to which Buscetta would have testified had he been asked about them at the trial. Badalamenti contends first that Buscetta believed that Badalamenti could not have been in-volved in drugs because Badalamenti was a member of the "old school mafia" which did not get involved in such things. Second, Badalamenti claims that Buscetta, if asked, would have testified that, in his opinion, the coded conversations on the intercepts did not pertain to narcotics.

As proof that the government knew of Buscetta's alleged opinions, Badalamenti offers (1) Buscetta's unsworn testimony in the Italian Maxi-trial in Palermo,[11] (2) a transcript in Italian and its translation into English of taped conversations between Buscetta and an American journalist, Jane Ryder, over dinner in Italy and an affidavit from Ms. Ryder,[12] and (3) an affidavit from Charles Rose, the former chief of the Narcotics Section of the United States Attorney's Office for the Eastern District of New York.[13]

### 1. Standard for Evaluating Claim of Government Suppression

▉ In order to establish a *Brady v. Maryland* violation, the defendant must show that (1) the government suppressed favorable evidence, and (2) the evidence the government suppressed was material.[14] A defendant cannot satisfy the suppression requirement if the defendant, directly or through counsel, "either knew, or should have known, of the essential facts permitting him to take advantage of [that] evidence."[15] As for the materiality requirement, "favorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."[16] "A 'reasonable probability' is 'a probability sufficient to

7. *See Casamento*, 887 F.2d at 1157–59 (reviewing sufficiency of evidence against Badalamenti).

8. Tr. 1285.

9. Tr. 1286.

10. Tr. 1755–56, 1760–63, 1764.

11. Schoenbach Decl. ¶¶ 21, 34 & Exs. E, F.

12. *Id.* ¶¶ 26–29 & Exs. A, B.

13. Rose Aff.

14. *United States v. Payne*, 63 F.3d 1200, 1208 (2d Cir.1995), *cert. denied*, 516 U.S. 1165, 116 S.Ct. 1056, 134 L.Ed.2d 201 (1996).

15. *United States v. LeRoy*, 687 F.2d 610, 618 (2d Cir.1982), *cert. denied*, 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983).

16. *United States v. Avellino*, 136 F.3d 249, 256–57 (2d Cir.1998).

undermine confidence in the outcome' of the case." [17]

### 2. *Buscetta's Opinion Regarding the Old School Mafia*

■ As the first step in his argument, Badalamenti offers two pieces of evidence in support of his claim that Buscetta in fact believed that Badalamenti could not have been involved in drug trafficking because he was a member of the old school mafia: Buscetta's testimony at the Italian Maxi-trial and the Charles Rose affidavit. The transcripts of Buscetta's testimony in the Italian Maxi-trial, which took place six months after Buscetta had testified in the Pizza Connection trial,[18] quote Buscetta as stating that he previously had told an Italian judge that "[it] would have been impossible for [Badalamenti] to deal in drugs without having contacts with people belonging to the family," which, he stated, Badalamenti did not have.[19] In his affidavit, Charles Rose stated that Buscetta called him during his testimony in the Pizza Connection trial and asked to speak with him. At their subsequent meeting, Buscetta informed Rose that "Badalamenti could not be involved in heroin trafficking because Mr. Badalamenti was part of the 'old school mafia' who banned such criminal activity ... [and] that he wanted to testify as to his beliefs, but felt be [sic] was being prevented from doing do [sic] by the prosecutors." [20]

Assuming the admissibility of these submissions,[21] they do not demonstrate that Badalamenti is entitled to relief because Badalamenti "either knew, or should have known, of the essential facts permitting him to take advantage of [that] evidence." [22]

Badalamenti knew of his and Buscetta's affiliations with the old school mafia and of the alleged divergence of views between the old and new schools with regard to drug trafficking. In fact, Badalamenti's counsel based a portion of his summation on the distinction.[23] Badalamenti's lawyer stated during Buscetta's cross-examination, out of the presence of the jury, that he hoped to elicit "evidence, that is known among people in La Cosa Nostra, such as Mr. Buscetta, that [Badalamenti] is not a drug dealer [and] that his alignment with those who oppose drugs is very material to demonstrating that." [24] During Buscetta's cross-examination, Badalamenti's counsel asked Buscetta whether he and Badalamenti were men of the old mentality of La Cosa Nostra,[25] the reasons for Badalamenti's expulsion from the Sicilian mafia,[26] whether he had ever heard Badalamenti speak out about drug trafficking [27] and whether he knew if Badalamenti was involved in drugs.[28] He elicited testimony that Buscetta "was certain that [Badalamenti] was not working in drugs." [29] Thus, there is every indication that Badalamenti was aware at the time of trial of Buscetta's opinions as to the supposed differences between the old and new schools of mafia, the implication of that distinction to narcotics trafficking, and as to Badalamenti's involvement in narcotics trafficking. Nor has Badalamenti offered any indication that the Italian trial testimony was not publicly available to the defense during the trial.[30]

17. *Payne*, 63 F.3d at 1209.

18. Schoenbach Reply Decl. ¶ 10.

19. Schoenbach Decl. Ex. F at 6.

20. Rose Aff. ¶ 4.

21. As discussed in some detail below, the Italian trial testimony is hearsay as it is offered for the truth of Buscetta's assertions as to his beliefs at the time of the Pizza Connection trial regarding Badalamenti's affiliation with the old school mafia. As the Court concludes that Badalamenti would not be entitled to relief, even assuming the truth of all of this evidence, nothing turns on the point.

22. *LeRoy*, 687 F.2d at 618.

23. *E.g.*, Tr. 40584–85.

24. Tr. 1266–67.

25. Tr. 1263.

26. *See, e.g.*, Tr. 1274.

27. Tr. 1285–86.

28. Tr. 1259, 1285–86.

29. Tr. 1286.

30. *See, e.g.*, *LeRoy*, 687 F.2d at 618 ("The Government is not required to disclose grand jury testimony to a defendant who is 'on notice of the

As Badalamenti knew or had ample means of discovering Buscetta's alleged views concerning the likelihood of Badalamenti's involvement in the drug trade based on the "old school" mentality, he has not satisfied the suppression requirement.

### 3. Buscetta's Opinion With Regard to the Intercepts

Badalamenti argues also that the government suppressed Buscetta's opinion that certain tapes did not relate at all to Badalamenti's involvement with drugs but rather revealed a plot to lure Badalamenti to the United States in order to kill him. Badalamenti's argument has two strains. First, he contends that the government suppressed Buscetta's opinion regarding the meaning of the coded tapes that were played at trial. Second, he argues that Buscetta formed his opinion of the plot to kill Badalamenti in part on the basis of tapes that never were turned over to the defense. He again offers Buscetta's Italian Maxi-trial testimony as well as the transcript of the taped conversations between Buscetta and Jane Ryder.

Buscetta testified at the Italian Maxi-trial that "the Americans did not interpret those phone calls the way I interpreted them.... The only involvement that [Badalamenti] had in drugs was that those people wanted to kill him, by order of the Sicilians." [31] Similarly, the relevant portion of Ms. Ryder's translation of her dinner conversations with Buscetta is as follows:

> [Buscetta] "But Badalamenti doesn't say anything in those phone calls. (UI) even says: 'Mmm, he is all against it ...' And don't you see what they have done to get him? At a certain point, in the course of the phone call from America, he says: 'But how can we do it if he doesn't come to New York .... and he calls and says: 'You haven't done what you were supposed to do."

\* \* \* \* \* \*

[Buscetta] "They took the decision over here. 'We have made the proposals', and this is what transpires from the phone calls. 'Badalamenti like that one ...' but they were made by those who wanted to lure him to go to the United States to do him in."

[Ryder] "Did you already know this at the time of the New York trial?"

[Buscetta] "I already said that at trial, because they had given me a tape for me to listen. After I had listened to all the tapes, I told them 'Look, listen to this, it's clear, they're waiting for him here in America to kill him. At a certain point they say: But we have his [nephew or grandson], if you like we can do in his [nephew or grandson], is that good?' 'No, no, we'd better wait for him.' So Badalamenti was aware of that. The Americans also were aware of everything."

\* \* \* \* \* \*

[Ryder] So, my question is different. So, if it was just a trick, in what way ... why did those men in New York make those phone calls?

[Buscetta] But those phone calls had one purpose only: to get Badalamenti.... The only purpose they had was to lure Badalamenti there, to kill him. So their phone calls are true, they are true. Because they want to do him in. So they make the most advantageous proposals possible to Badalamenti. But he didn't go there.

[Ryder] But did you explain all this to Giuliani?

[Buscetta] No, I told all this to Dick Martin.

[Ryder] And what did he tell you?

[Buscetta] No, it's fine, but this is not important.

[Ryder] So he didn't give a damn. The were not interested in knowing that?

essential facts which would enable him to call the witness and thus take advantage of any exculpatory testimony that he might furnish,' " where the defendant knew that there had been grand jury testimony by the witness). Even if the Italian Maxi-trial transcript were not publicly available, Badalamenti has not made any showing

that the government even was aware of Buscetta's testimony at that trial. See Tr., 2/10/98, 23–24.

31. Schoenbach Decl. Ex. F at 7.

[Buscetta] But the trial was against that very man. Because 'i lamenti' were the real traffickers, the Catalanos were those who were responsible for the drugs. But they tried to convict ·Gaetano Badalamenti, asserting that he was trafficking drugs, because they· wanted ·to hit him hard. That is the thing.. Because 'prelevanza' said no, it was not him who sent Catalano, and who is this Catalano.[32]

According to Badalamenti, Buscetta's comments reveal his belief that the tapes played at trial did not relate to drug trafficking but rather to a plot to lure Badalamenti to New York to kill him and that the prosecutors were aware of this opinion. Additionally, Badalamenti contends that Buscetta listened to other tapes that described the plot and that never were turned over to the defense.

a. *Buscetta's Opinion Regarding the Tapes Played at Trial*

 Even if Buscetta told the prosecutors that he believed the tapes played at trial did not involve drugs at all, but rather a plot to kill Badalamenti, Badalamenti has not demonstrated that the government suppressed that opinion.[33] The defense obtained copies of the intercept tapes well before trial and were aware that the interpretation of the references on the tapes was of central importance to Badalamenti.[34] The defense knew also that Buscetta had listened to the tapes, as he was asked at trial to identify the voices on them,[35] and that he was examined at trial as an expert on the mafia. Finally, the defense knew that Buscetta thought that people were looking for Badalamenti in order to kill him, as Buscetta in fact testified.[36]

The defense therefore knew all of the facts that would have allowed it to ask Buscetta on the stand his opinion regarding the meaning of the tapes.[37]

 "A defendant ... cannot satisfy the suppression requirement if the defendant ... 'either knew, or should have known', of the essential facts permitting him to take advantage of [that] evidence. [citation omitted] If the defendant has information, but fails to use due diligence to make use of it, the defendant cannot later claim that the government 'suppressed' the evidence."[38] Badalamenti's contention falls squarely within this principle. Consequently, the Court concludes that the government did not suppress this information.

b. *Buscetta's Opinion Regarding Tapes Not Disclosed to the Defense*

 *Brady* requires the government to disclose only evidence which is favorable, and material, to the defense. Evidence is favorable if the Court determines that it "would tend to exculpate [the defendant] or reduce the penalty."[39] Badalamenti argues that it would have been favorable to the defense for Buscetta to have testified as to conversations he had heard on some· undisclosed tapes, and to play the tapes, which he argues tended to show that, in Buscetta's opinion, there was a plot to lure Badalamenti to the United States in order to kill him. This evidence, according to Badalamenti, would have demonstrated that Badalamenti was not talking with people in the United States in order to conspire with them to traffic in drugs but rather in consequence of

---

**32.** Ryder Aff. at 4–12.

**33.** The government submits affidavits to demonstrate that the prosecutors believed that Buscetta interpreted the tapes to mean that Badalamenti in fact was involved in drug trafficking. The Court, however, may not resolve issues of fact on affidavits. *United States v. Aiello,* 814 F.2d 109, 113–14 (2d Cir.1987).

**34.** Tr., 2/10/98, 27.

**35.** Tr. 931–34, 961 *et seq.*

**36.** Tr. 1319.

**37.** Badalamenti complains that he was prevented from asking Buscetta his opinion regarding the

content of the tapes by a ruling of the trial court. *See* Tr., 2/10/98, 15; Tr. 934; Schoenbach Decl. ¶ 25. But this argument ignores the fact that Badalamenti's counsel expressly reserved the right to recall Buscetta. *See* Tr. 1320 ("I have no further questions on behalf of Gaetano Badalamenti. However, your Honor, I would like him subject to recall for the defense case in chief.").

**38.** *United States v. Morales,* 916 F.Supp. 336, 339 (S.D.N.Y.1996) (quoting *LeRoy,* 687 F.2d at 618), *aff'd,* 107 F.3d 5, 1997 WL 32969 (2d Cir.1997)).

**39.** *Brady,* 373 U.S. at 88, 83 S.Ct. 1194.

their effort to "execute him." Badalamenti, however, has failed to illuminate how such a plot relates to the charges against him.

The primary evidence against Badalamenti involved taped conversations which referred to shipments of "shirts," "cans," "acrylic," and so on, not conversations about Badalamenti's trips or possible trips to the United States.[40] That there may have been a plot to lure Badalamenti to New York in order to kill him neither would have exculpated Badalamenti of the narcotics trafficking charges nor impacted the penalty he received. Buscetta's belief with respect to the plot to kill Badalamenti therefore was not favorable in the sense referred to in *Brady.* Moreover, it is far from clear that there is any necessary or even likely inconsistency between Badalamenti having been the target of a murder plot and a drug trafficker as well.

■ Nor has Badalamenti shown that Buscetta's opinion or the allegedly suppressed tapes on which it allegedly was partly based, was material. Evidence is material under *Brady* if the Court finds "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."[41] First of all, Buscetta testified at trial in response to questions from Badalamenti's counsel that the Corleones were looking for Badalamenti to kill him and that Badalamenti was aware of this.[42] Second, Badalamenti has failed to show any significant likelihood that the jury's deliberations were impacted in any way by the absence of these tapes themselves, especially in light of the fact that Buscetta testified to the alleged content of the tapes—the plot to kill Badalamenti. Thus, the other tapes regarding the plot to kill Badalamenti were not material under *Brady.*

■ Finally, Badalamenti has failed to demonstrate that the government suppressed Buscetta's opinions regarding the content of the tapes. Badalamenti's counsel inquired of Buscetta at trial whether he was aware of the plot to kill Badalamenti,[43] and Buscetta plainly stated to Ryder that Badalamenti himself was aware of the plot.[44] Badalamenti thus was aware of the plot to lure him to New York to kill him and aware of Buscetta's knowledge of the plot. Badalamenti knew all of the facts which would have allowed him to examine Buscetta as to his view of the meaning of the tapes that the government offered in light of Buscetta's claim regarding the plot to kill Badalamenti, but he failed to do so. Because the evidence was not suppressed within the meaning of *Brady,* the Court finds no error.

### 4. *Badalamenti's Request for an Evidentiary Hearing*

■ Badalamenti requests an evidentiary hearing in which to develop and establish the factual bases for his claim of government suppression of evidence. While the foregoing fully disposes of this claim, the Court discusses the standards that determine a Section 2255 movant's right to a hearing both because Badalamenti's failure to satisfy them provides an independent basis for the denial of relief on part of this claim and because they are relevant elsewhere in this opinion.

Section 2255 provides that "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall ... grant a prompt hearing thereon." Although Rule 8(a) of the Rules Governing Section 2255 Proceedings for the United States District Courts directs the district judge to determine whether to hold an evidentiary hearing, neither Rule 8(a), the Advisory Committee Note to it, nor the comparable habeas rule provides guidance to the Court in making this determination except that the latter note refers to a statement in *Townsend v. Sain*[45] that a hearing is required when "the facts are in dispute."

**40.** *See Casamento,* 887 F.2d at 1157–59.

**41.** *Avellino,* 136 F.3d at 256–57.

**42.** Tr. 1319.

**43.** *Id.*

**44.** Ryder Aff. at 5 ("Badalamenti was aware of that. The Americans also were aware of everything.").

**45.** 372 U.S. 293, 312, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963).

The Supreme Court has acknowledged that some allegations are too vague, conclusory or "palpably incredible" to warrant a hearing, but has held that the failure to hold a hearing in the face of detailed factual allegations, which concern matters within the affiant's personal knowledge which, if true, would afford a basis for relief, is error.[46] But the movant's burden goes somewhat further.

In *United States v. Aiello*,[47] the Second Circuit held that an evidentiary hearing is required on a Section 2255 motion only when the papers on the motion, measured by the same standards of competence and admissibility applicable to motions for summary judgment, reveal the existence of a genuine issue of material fact. Hence, in order "[t]o warrant plenary presentation of evidence, the application must contain assertions of fact that a petitioner is in a position to establish by competent evidence."[48] "In making that threshold determination the court looks primarily to the affidavit or other evidence proffered in support of the application in order to determine whether, if the evidence should be offered at a hearing, it would be admissible proof entitling the petitioner to relief. Mere generalities or hearsay statements will not normally entitle the applicant to a hearing, since such hearsay would be inadmissible at the hearing itself."[49] Thus, even assuming that Badalamenti's allegations, if true, would warrant relief, he would be entitled to a hearing only if he has offered competent evidence, which would be admissible if offered at trial, to support his allegations.[50]

The first evidentiary basis for Badalamenti's motion is Buscetta's testimony at the Italian Maxi-trial, which took place six months after Buscetta testified in the Pizza Connection trial.[51] As discussed above, Buscetta there testified that he previously had stated to an Italian judge his belief that Badalamenti could not have been involved in drugs without connections to "the family," that the Americans did not interpret the phone calls in the same way he had, and that the "only involvement that [Badalamenti] had in drugs was that those people wanted to kill him." Badalamenti offers these statements for the truth of the matters asserted—that Buscetta believed Badalamenti could not have been involved in drugs and that Buscetta interpreted the tapes differently from the American authorities—and thus are hearsay.[52] Furthermore, although Buscetta's statements purportedly were based on his personal knowledge of his own opinion, they admittedly were unsworn and therefore insufficient.[53]

**46.** *Machibroda v. United States*, 368 U.S. 487, 495–96, 82 S.Ct. 510, 7 L.Ed.2d 473 (1962).

**47.** 814 F.2d 109.

**48.** *Id.* at 113; *see also Dalli v. United States*, 491 F.2d 758, 760 (2d Cir.1974) ("a judge is well within his discretion in denying a petition when the supporting affidavit is insufficient on its face to warrant a hearing.").

**49.** *Dalli, id.*

**50.** Of course, if he offered competent, admissible proof that was not controverted by the government, there would be no need for a hearing.

**51.** Schoenbach Reply Decl. ¶ 10.

**52.** Badalamenti argues that Buscetta's testimony at the Italian Maxi-trial was not hearsay because it was a statement against interest. FED.R.EVID. 804(b)(3). But there is no merit to this argument. In any case, as the Court has concluded that Buscetta's statement at the later Italian trial was completely consistent with his testimony at the Pizza Connection trial, there is no basis for

Badalamenti's argument that Buscetta's statement "so far tended to subject the declarant to civil or criminal liability ... that a reasonable person in the declarant's position would not have made the statement unless believing it to be true" as required by the Rule.

**53.** *See* Schoenbach Ltr. of 4/7/98 ("I can report to the Court that the proffered testimony of Mr. Buscetta, before a three-judge panel in Italy, was *not* given under oath. The Italian system has no such requirement and witnesses do not take an oath.").
Badalamenti argues also that the rules governing habeas petitions require only "an affidavit based upon personal knowledge," not that the affidavit be a statement under oath. This argument is patently frivolous. An unsworn declaration not made under penalty of perjury nor stating the document is true is not an affidavit. *E.g., Williams v. Pierce Co. Bd. of Comm'rs*, 267 F.2d 866, 867 (9th Cir.1959) ("There was no certificate that the appellant took any oath, or swore to his statement. The document was not an affidavit."); *Miller Studio Inc. v. Pacific Import Co.*, 39 F.R.D. 62, 65 (S.D.N.Y.1965) ("This paper, since it is not sworn to, is not an affidavit.").

██ The tapes of Buscetta's conversations with Ms. Ryder and the corresponding translated transcripts also are hearsay, as they were out-of-court statements Buscetta made to Ms. Ryder offered to demonstrate that Buscetta, at the time of the Pizza Connection trial, held the opinions regarding Badalamenti's involvement in drugs that he purported to hold.[54] Thus, they too would be inadmissible and are insufficient.[55]

## B. Suppression of Evidence Regarding Buscetta's Alleged CIA Affiliation .

██ Badalamenti claims also that the government failed to inform the defense that Buscetta was an operative for the Central Intelligence Agency ("CIA"), as supposedly evidenced by (1) an Interpol fact sheet on Buscetta,[56] and (2) a copy of a letter which purports to be from the Swiss Country Attache for the U.S. Drug Enforcement Agency ("DEA") to the Chief of "Swiss Central Narcotics" and which contains a warning that "any attempt to Copy this Document May result in Severe Damage to Copy Machine and Operator."[57] The government counters with affidavits from two DEA officials, one of whom was the purported author of the letter submitted by Badalamenti, which make amply clear that the DEA never uses any paper which will cause injury if copied and that the affiants never have seen any evidence, nor heard, of any affiliation between Buscetta and the CIA.

The Supreme Court has made clear that district courts have discretion to deny an evidentiary hearing where the allegations contained in the motion are "palpably incredible"[58] or "patently frivolous or false."[59] The Second Circuit in Aiello conditioned a hearing on whether the moving papers "contain assertions of fact that a petitioner is in a position to establish by competent evidence."[60] "Airy generalities, conclusory assertions and hearsay statements will not suffice because none of these would be admissible evidence at a hearing."[61]

██ The DEA letter, even if authentic, obviously constitutes inadmissible hearsay, as it is offered to prove that Buscetta was affiliated with the CIA. Additionally, the DEA "exploding" letter bears no indicia of authenticity and thus would be inadmissible under FED.R.EVID. 901. The letter on its face is "palpably incredible." The Interpol fact sheet mentions nothing of Buscetta's alleged CIA connection and therefore would not demonstrate that Badalamenti is entitled to relief even if it were competent and admissible. Thus, Badalamenti has offered no indication that he is in a position to establish by competent evidence that Buscetta ever was an operative of the CIA. Without competent evidence to support his assertion that Buscetta was a CIA operative, Badalamenti's claim of suppression of that evidence must fail.

54. The statements are not admissible under FED R.EVID. 803(3) because, to the extent relevant, they went to Buscetta's prior, not his then existing, state of mind.

55. Badalamenti argues that any defects in his submissions ought to be overlooked because Buscetta is in the Witness Security Program, Schoenbach Reply Decl. ¶ 6, and therefore within the exclusive control of the government, rendering it difficult for Badalamenti to secure an affidavit from him to support his claims. In fact, however, Badalamenti's counsel met with Buscetta, Buscetta's attorney, an Italian government translator, and two members of the Italian Anti–Mafia police in Rome in 1995 at the request of Badalamenti's counsel. (Schoenbach Reply Decl. ¶ 4 & n. 4) Badalamenti's counsel then requested that Buscetta commit his allegations to writing, but Buscetta, acting on the advice of counsel, refused. While Buscetta stated that he was willing to testify at a hearing because he

wanted "to tell the truth," id. at ¶ 5, he did not confirm the allegations detailed by Badalamenti's counsel. (Fitzgerald Aff. ¶ 23) Nor is there is any evidence that the government prevented Badalamenti from obtaining an affidavit. Indeed, the fact that Badalamenti's counsel met with Buscetta suggests the contrary.

56. Schoenbach Decl. ¶¶ 35–41 & Ex. C.

57. Schoenbach Ltr. of 9/25/96, Ex. A.

58. Machibroda, 368 U.S. 487, 82 S.Ct. 510, 7 L.Ed.2d 473 (1962).

59. Blackledge v. Allison, 431 U.S. 63, 76, 97 S.Ct. 1621, 52 L.Ed.2d 136 (1977).

60. 814 F.2d at 113.

61. Id. at 113–14.

## C. *Prosecutorial Misconduct*

 Badalamenti's final claim with respect to Buscetta is that the prosecutors threatened Buscetta after he gave exculpatory testimony regarding Badalamenti on cross-examination and forced him to change his testimony on redirect to be more favorable to the government. In support of this assertion, Badalamenti again offers the transcripts of the taped conversations between Buscetta and Ms. Ryder, in which Buscetta stated, *inter alia,* that (1) then Assistant United States Attorney Louis Freeh was upset that Buscetta testified on cross-examination that Badalamenti was not involved with drugs but that Buscetta reiterated to Freeh that he had no personal knowledge of Badalamenti trafficking in drugs,[62] and (2) after Buscetta testified, Freeh and fellow prosecutor Dick Martin threatened to, or in fact did, arrest him and strip him of his immunity because, they said, Buscetta had trafficked in drugs with Badalamenti.[63]

 The standard with respect to whether the Court should hold an evidentiary hearing on these allegations of prosecutorial misconduct is the same as with the suppression of *Brady* material; that is, an evidentiary hearing is warranted where the submissions contain competent and admissible evidence which, if offered at a hearing, would entitle the movant to relief. The Court finds that Buscetta's statements in the Ryder tapes are inadmissible hearsay for the reasons discussed above. Even if Buscetta's statements in the tapes were admitted at a hearing, however, they would not support the inferences that Badalamenti would have the Court draw.

A careful reading of Buscetta's statements in the transcripts reveals that any arrest or threatened arrest of Buscetta occurred *after* the conclusion of both his testimony and the entire trial and while the defendants awaited sentencing. Buscetta so states on the Ryder tapes no less than three times.[64] Badalamenti's counsel conceded the point at oral argument.[65] Consequently, there is nothing to Badalamenti's theory that this threatened arrest occurred after Buscetta had testified on cross-examination and was awaiting redirect. Nor is there any basis for Badalamenti's assertion that these alleged threats were made for the purpose or, indeed, with the effect of inducing Buscetta to change his testimony on redirect. Construing the tapes most favorably to Badalamenti, they show only that the government was unhappy with this aspect of his cross but that the alleged pressure came only after Badalamenti completed all of his testimony. Hence, even

---

62. Buscetta allegedly stated: "At a certain point Badalamenti's lawyer turned to me and asked me: 'Did you say that my client was involved in drug trafficking?' I said that he was not. Then, later assistant prosecutor Louis Freeh calls me and tells me: 'You managed to acquit Badalamenti!'. 'No', I replied. Because I never witnessed him (trafficking drugs), I have to say that I never witnessed him doing it'. But he replied: 'You acquitted him.' Then while the jury was not present, because we were asked to leave the courtroom, he said: 'Badalamenti's lawyer has asked the question whether he assisted Badalamenti in drug trafficking. He said that he didn't assist him in that. He said you didn't because it is obvious that he didn't. But Buscetta know that he was involved in drug trafficking, therefore we have to ask that question in another way'. The presiding Judge accepted that. Therefore the Court and Badalamenti's lawyer are the ones who convicted Badalamenti. It was not me, because I wasn't even present.'" Ryder Aff. at 8.

63. *Id.* at 13–14 ("You know, after I testified, they wanted to arrest me. They wanted to strip me of my immunity.... Dick Martin and Louis Freeh arrested me. Because he had told the truth in front of the Judge. 'We have arrested you because you and Badalamenti trafficked drugs. And we have evidence for it all.' "); *id.* at 14 ("[The trial] was already over, but the sentence had not been given yet; but I had already finished with my testimony, and the trial was already over.").

64. *Id.* at 13 ("after I testified, they wanted to arrest me"); *id.* at 14 (the trial "was already over, but the sentence had not been given yet; but I had already finished with my testimony, and the trial was already over"); *id.* (after Ryder asked whether there was a chance that he might be asked to go back and testify after he was threatened, Buscetta replied, "No.").

65. Tr., 2/10/98, 30 ("I agree with you it says at the end of the trial."). Counsel argued that Buscetta did not mean that the "trial" was over but rather his own testimony, *id.* 31, but offers no support for this contention.

crediting this unsworn dinner conversation, there was no prosecutorial misconduct.

■ Badalamenti is not entitled to relief on this newly discovered evidence for the additional reason that at the time of trial Badalamenti "either knew, or should have known, of the essential facts permitting him to take advantage of the evidence." [66] On cross-examination by Badalamenti's counsel, Buscetta testified that he did not "personally" know of Badalamenti being involved in drug trafficking, that Badalamenti did not deal in drugs, and that he was certain that Badalamenti was "not working in drugs." [67] Then on redirect, Buscetta clarified his earlier testimony. He stated that when "one says personally I mean to say I never saw nor did he speak to me personally nor did I see him dealing with others in drugs." [68] He testified also that when he had stated that he was "certain" that Badalamenti was not dealing in drugs he was referring only to the years up until 1982. He stated additionally that his beliefs regarding Badalamenti's involvement with narcotics were based on the fact that Badalamenti was expelled from the Sicilian mafia whose contacts Buscetta thought necessary for any drug business. [69] Finally, Buscetta stated that when he was asked about whether Badalamenti dealt in drugs he had been referring only to heroin and not to cocaine. [70]

The defense was aware of these alleged "changes" in Buscetta's testimony. In fact, Badalamenti's counsel made allusions to the possibility of Buscetta having been threatened to change his testimony during the interim between cross and redirect examinations. [71] Nothing prevented Badalamenti from inquiring on re-cross examination whether anyone had said anything to Buscetta to induce him to change his testimony. As the essential facts which would have allowed Badalamenti to take advantage of any threats made to Buscetta were known to Badalamenti at the time of trial, the evidence was not "suppressed" and Badalamenti's request for relief on that basis therefore is denied.

## D. Ineffective Assistance of Counsel

Badalamenti raises also four alleged shortcomings in his counsel's performance at trial. According to Badalamenti, his trial counsel failed to (1) seek an *in limine* ruling defining permissible areas of cross-examination before putting Badalamenti on the stand, which supposedly resulted in Badalamenti invoking the Fifth Amendment before the jury, [72] (2) pursue alleged translation errors that were called to his attention, [73] (3) adduce evidence regarding Badalamenti's involvement in a clothing business, which allegedly would have provided an innocent explanation for certain statements on the intercepts, [74] and (4) authenticate documents regarding Badalamenti's prison stays with Buscetta. [75]

### 1. *Failure to Seek* In Limine *Ruling*

■ Badalamenti testified on his own behalf at trial. [76] On direct examination, Badalamenti testified, *inter alia*, that he was facing criminal charges in Italy and was worried that any answers he might give in the cur-

66. *LeRoy*, 687 F.2d at 618.

67. Tr. 1259, 1285–86.

68. Tr. 1621.

69. Tr. 1754–55.

70. Tr. 1760–63.

71. Tr. 1640 ("The witness [Buscetta] understood his position until this man took him in the back room."); Tr. 1651 ("fundamentally I object to this man, who had the opportunity to present the truth to the world and deliberately did not, now coming in, trying to mess up a record that is fundamentally clear and that this witness has explained.... Now they have this man, whom they own, they take him back in the back room

for God knows what purposes, he comes back out and his is more contrite.... Not only is it unfair, it smells and it looks bad.").

72. Schoenbach Decl. ¶¶ 43–48; Badalamenti Aff. ¶¶ 5–9.

73. Schoenbach Decl. ¶ 49; Badalamenti Aff. ¶ 17.

74. Schoenbach Decl. ¶¶ 50–51; Badalamenti Aff. ¶¶ 10–16.

75. Schoenbach Decl. Ex. G; Badalamenti Aff. ¶ 9.

76. *See* Tr. 28694–29650.

rent trial would jeopardize his defense in Italy.[77] He then answered certain of the questions posed by his attorney but refused to answer others. Most notably, Badalamenti testified that the coded conversations on the intercepts did not pertain to drug trafficking, but he refused to explain their meaning.[78] Badalamenti later justified his refusal by asserting that he feared incrimination in Italy on mafia, not drug, charges and that he never would reveal matters he learned in confidence.[79] On cross-examination, the government asked Badalamenti a number of questions which he refused to answer, particularly questions about his role in the Sicilian mafia and any affiliations he might have had with La Cosa Nostra.[80] As a result of his refusals, Badalamenti ultimately pled guilty to one count of criminal contempt.[81]

Badalamenti now argues that his counsel was constitutionally inadequate in failing to secure an *in limine* ruling from the court as to the scope of the cross-examination that would be permitted prior to putting him on the stand. The government responds that it was a clear tactical decision to put Badalamenti on the stand, elicit his exculpatory testimony, and then have Badalamenti refuse to testify to those areas that were damaging. More basically, however, the government contends that this particular claim of ineffective assistance was waived through Badalamenti's failure to assert it on direct appeal.

In *Billy–Eko v. United States*,[82] the Second Circuit held that Section 2255 movants alleging claims of ineffective assistance of counsel not raised on direct appeal may do so even absent a showing of cause and prejudice if: (1) the movant was represented on appeal by the same attorney as at trial, or (2) the claim is not based solely on the record developed at trial.[83] If, however, the movant had new appellate counsel and the alleged error is based entirely on the record developed at trial, a Section 2255 movant must demonstrate cause and prejudice why the ineffective assistance of counsel claim was not raised on direct appeal.[84]

Badalamenti contends that *Billy–Eko* does not apply because his appellate counsel, Charles Carnesi, had represented him from the time of his arraignment until one month before trial. This argument misconstrues *Billy–Eko*. The Second Circuit there held that it would be "unrealistic" to expect an attorney who represents an accused at trial to pursue an ineffective assistance claim because, in part, "even the scrupulous attorney searching the record in good faith would likely be blind to his derelictions at the trial level."[85] That Carnesi represented Badalamenti for a period of time prior to trial, however, would not close his eyes to errors of Badalamenti's trial counsel, Michael Kennedy, especially where the error complained of—the failure to seek an *in limine* ruling—occurred after Mr. Carnesi's representation of the defendant had ceased.

This alleged error, if error it was, moreover, is apparent from the record. Badalamenti's refusals to answer certain questions, both on direct and on cross-examinations, are thoroughly apparent. The record shows that Badalamenti's counsel did not seek an *in limine* ruling, that Badalamenti refused to answer a number of questions while on the stand, that Judge Leval instructed the jury that it was permitted to draw negative inferences based on his refusals, and that the government made much of Badalamenti's refusals in its summation. As Badalamenti has

77. Tr. 28695.

78. Tr. 28820–22.

79. Tr. 28822, 40664–65.

80. *See, e.g.,* Tr. 28878–79, 28883–84, 28904, 28995–97.

81. *See Casamento,* 887 F.2d at 1147.

82. 8 F.3d 111 (2d Cir.1993).

83. *Id.* at 114–15.

84. *Id.* at 115 ("If the defendant has new appellate counsel on direct appeal, and the record is fully developed on the ineffective assistance issue, there is little reason to extend the defendant an unlimited opportunity to delay bringing the claim. Thus, in this narrow category of cases, but only in these cases, the petitioner must still show cause for not bringing the ineffective assistance claim on direct appeal, and prejudice resulting therefrom.")

85. *Id.* at 114.

offered no cause for his failure to raise the *in limine* argument on direct appeal, his failure to raise it procedurally defaulted the claim.

 Even absent *Billy–Eko*, the claim would have no merit. In order to prevail, Badalamenti must demonstrate that (1) his trial counsel's performance fell below "an objective standard of reasonableness" under "prevailing professional norms," and (2) there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[86] "Actions or omissions by counsel that 'might be considered sound trial strategy' do not constitute ineffective assistance."[87]

Here there is an abundance of evidence that trial counsel's decision to put Badalamenti on the stand without an *in limine* ruling was purely tactical. The third question posed to Badalamenti by his counsel on direct examination was whether he was facing charges in Italy and whether he understood that any testimony in the Pizza Connection trial could be used against him there.[88] Badalamenti then testified to his version of the events on direct examination but refused to answer questions posed by the government on cross-examination. Badalamenti thus effectively was able to put before the jury an exculpatory version of events without having to explain inconsistencies or fabrications during cross-examination. The trial judge certainly viewed the unfolding of Badalamenti's testimony as a tactical decision.[89] Consequently, Badalamenti has failed to show that his counsel's tactical decision fell below an objective standard of reasonableness.

### 2. Failure to Pursue Translation Errors

 Badalamenti complains also that his trial counsel erred in failing to pursue al-leged errors in the Sicilian translations provided at trial. The two examples offered by Badalamenti were the references to "bruklooni," which he contends means fruit or cheese rather than being a reference to conspirators in Brooklyn, and to "matzdoco," which he argues meant "everyone" rather than co-defendant Mazzurco.[90] Badalamenti has failed, however, to state where in the 40,000+ page transcript these alleged translation errors occurred, in what context they were made, or what if any prejudice the alleged errors caused him. Nor has he indicated why it was objectively unreasonable for his counsel to have failed to pursue these two translation errors in light of the overwhelming record in this case and the attendant task of preparing a defense in such a massive trial. Because Badalamenti's allegations are vague and conclusory, no evidentiary hearing is warranted, and his request for relief on this ground is denied.

### 3. Failure to Investigate Clothing Business Ties

 Badalamenti's third ineffective assistance of counsel claim is that his trial counsel failed to investigate Badalamenti's ties to the clothing industry which allegedly would have provided an innocent explanation for the intercept on which he was heard to discuss shipments of "shirts," "acrylic" and other clothing items. Specifically, Badalamenti contends that his counsel failed to call a witness from Rio De Janeiro who produced tee shirts for him in 1983 for shipment to Europe and who is said to have had documents including bills of sale and bills of lading to demonstrate that the shirts existed and that the prices for the shirts correspond-

**86.** *Strickland v. Washington*, 466 U.S. 668, 688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

**87.** *Kieser v. New York*, 56 F.3d 16, 18 (2d Cir. 1995) (quoting *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052).

**88.** Tr. 28695.

**89.** Tr. 28974 ("this effort to concoct a package that protected [Badalamenti] from cross-examination, made him impervious to being questioned on the central evidence in the case, taking the Fifth Amendment and in so doing explaining to the jury that he had absolutely no concerns about anything related to drugs, which is what this case is about."); *id.* at 29444 ("I think the government has been placed in a very unfair position by placing the defendant on the stand with a preconceived plan of having him testify self-servingly on certain things and then hide behind a refusal to testify to other things."); *id.* at 29448–49 ("It was a previously planned strategy that was designed to have it both ways and put the government in a very bad position.").

**90.** Schoenbach Decl. ¶ 49.

ed to the prices discussed on the intercepts.[91] Badalamenti alleges also that he requested that his counsel contact witnesses and subpoena documents from American customs agents at JFK airport in New York and French customs officials from Charles de Gaulle airport in France who could testify to the fact that on two occasions Badalamenti's shipments of what turned out to be tee shirts were seized under the mistaken impression that they were drugs.[92]

Beyond his own affidavit, Badalamenti has not submitted any proof of these ties to the clothing industry. Badalamenti's counsel stated on the record during the trial that he had nothing to return under a government subpoena which called for any records or documents with respect to Badalamenti's involvement in clothing companies.[93] More importantly, Badalamenti himself was asked on direct examination about his commercial ventures. Not once did he mention any business he had in the clothing industry.[94] Badalamenti, moreover, refused to answer when asked about the meaning of the coded conversations.[95]

There is a reasonable explanation for this. That Badalamenti's lawyer never called witnesses regarding his alleged ties to the clothing business appears to have been a trial tactic to portray the intercepted conversations as concerning shipments of weapons, rather than clothing, in order to explain the secretive nature of the calls. The very last question Badalamenti's counsel asked of him on redirect was whether "[d]uring the course of the conversations we heard played here in court in which you participated were you ever speaking of arms or weapons in a coded fashion?"[96] Although an objection to this question was sustained, Badalamenti's theory that the conversations concerned weapons was before the jury. When considered with his professed fear of prosecution in Italy, Badalamenti's refusal to answer tended to substantiate his counsel's implication that the conversations must have been referring to weapons.

While Badalamenti's tactic to put before the jury his theory that he feared prosecution in Italy and then refuse to answer questions regarding the meaning of the tapes may have backfired, he cannot claim now that his counsel was in error in failing to call witnesses to-link him to the clothing industry. Badalamenti's own refusal to explain the tapes or to describe his clothing business undercuts his claim that his counsel's performance was not a tactic. Because Badalamenti's counsel undertook a sound if unsuccessful trial tactic, Badalamenti cannot demonstrate that his representation did not reach an objective standard of reasonableness. Moreover, it does not lie in Badalamenti's motion to accuse counsel of ineffectiveness on this ground in view of Badalamenti's own refusal to explain the tapes when asked.

4. *Failure to Authenticate Record of Prison Stay*

Finally, Badalamenti at trial offered what he claimed was an official record showing the dates during which he was in prison in Italy. The alleged significance of the document was its relationship to testimony allegedly given by Buscetta concerning a conversation that Buscetta claimed to have had with Badalamenti in 1975 while the two were in prison together relating to someone named Rappa. Badalamenti's point is that the document supposedly showed that Badalamenti was not in prison during that year. The document in his view therefore would have impeached Buscetta. The offer was rejected on the ground that the document was not properly authenticated. Badalamenti now alleges that his trial counsel was ineffective for failing to authenticate it.[97]

The Court assumes that Buscetta actually testified to such a conversation and placed it

91. Badalamenti Aff. ¶ 11.

92. Badalamenti Aff. ¶¶ 13–16.

93. Tr. 28795–96.

94. *See, e.g.,* Tr. 28371–742; *id.* at 28775–76; *id.* at 28780.

95. Tr. 28820–22.

96. Tr. 29629.

97. Schoenbach Decl. Ex. G; Badalamenti Aff. ¶ 9.

in 1975.[98] Nevertheless, Badalamenti is not entitled to relief for several reasons.

First, Badalamenti still has not produced an authenticated copy of the alleged Italian prison record. The document before this Court,[99] said to be a copy of that offered unsuccessfully at trial, is not authenticated in the manner required by Fed.R.Evid. 902(3). Indeed, the declaration of Badalamenti's present counsel to which the document is attached does not even refer to it. The only evidence now offered that even remotely goes to authenticity is Badalamenti's own affidavit, but even it does not demonstrate that Badalamenti has any personal knowledge on the point.

But there is an even more basic problem. In order to prevail on the claim of ineffective assistance, Badalamenti must demonstrate not only that counsel's performance fell below the requisite standard, but that the result of the proceeding probably would have been different but for counsel's errors.[100] Here, the evidence against Badalamenti was very strong and it consisted in important measure of the intercepted telephone calls regarding drugs. The point to which the prison record went was quite collateral. Badalamenti testified on cross-examination both that he was in jail in the 1970's and that he saw Buscetta when he was in jail, although he denied having had a conversation with Buscetta there regarding Rappa.[101] Had the Court received the record of Badalamenti's dates in prison, that evidence at best would have impeached Buscetta only as to whether the alleged conversation was in 1975, not as to whether it occurred, perhaps at another time in the 1970's. And impeaching the credibility of Buscetta, who had testified at other points favorably to Badalamenti, very well could have negatively impacted Badalamenti's defense.

As there is no showing that the failure to authenticate and offer the prison record prejudiced Badalamenti in the sense required by *Strickland v. Washington*, there is no merit to Badalamenti's argument that his counsel was ineffective for failing to introduce the prison record.

### E. Rutledge v. United States

Badalamenti was convicted both of conspiracy to import and distribute narcotics and of engaging in a continuing criminal enterprise ("CCE"). Badalamenti moves to vacate one of these convictions in light of *Rutledge v. United States*.[102] The Supreme Court there held it impermissible for a defendant to be convicted both of conspiracy under 21 U.S.C. § 846 and of conducting a CCE in concert with others under 21 U.S.C. § 848 because conspiracy is a lesser included offense of conducting a CCE and Congress is presumed to have intended to authorize only one punishment for such overlapping crimes. Prior to *Rutledge*, the Second Circuit long had adhered to the practice of entering judgment on both such convictions, but of sentencing defendants to concurrent sentences on the two charges.[103] This practice was condemned in *Rutledge*, which found that "[o]ne

---

**98.** There has been some difficulty in determining precisely what occurred at trial in this particular. The Court has relied upon the parties for copies of the relevant portions of the transcript, none of which contains any testimony by Buscetta concerning conversations he claimed to have had with Badalamenti while the two were in prison together. The portions provided by counsel, however, are not entirely complete. Moreover, when the Court pressed the issue as to whether Buscetta in fact gave the testimony on which this argument is based, the best that Badalamenti's counsel was able to do was to (1) point to a lengthy colloquy, out of the presence of the jury, in which the government offered to prove through Buscetta that there was an inculpatory conversation between Buscetta and Badalamenti while the two were in prison in 1975, and (2) represent that Badalamenti recalls that Buscetta so testified, albeit out of the presence of the jury.

See Schoenbach Ltr. 9/3/98. Nevertheless, the Court has given Badalamenti the benefit of the doubt and assumed that Buscetta testified before the jury as Badalamenti claims.

**99.** Schoenbach Decl. Ex. G.

**100.** *Strickland*, 466 U.S. at 691–92, 104 S.Ct. 2052.

**101.** Tr. 29168.

**102.** 517 U.S. 292, 116 S.Ct. 1241, 134 L.Ed.2d 419 (1996).

**103.** *See id.* at 1245 n. 5, 116 S.Ct. 1241 (citing *United States v. Aiello*, 771 F.2d 621, 634 (2d Cir.1985)).

of [petitioner's] convictions, as well as its concurrent sentence, is unauthorized punishment for a separate offense and must be vacated." [104] In light of *Rutledge*, the Second Circuit on several subsequent occasions has vacated defendants' conspiracy convictions as lesser included offenses of their CCE convictions.[105]

■■■ Badalamenti, who was convicted of both conspiracy and CCE, now seeks to have one of his convictions—preferably the CCE count—vacated in light of *Rutledge*.[106] As support for his proposition that the CCE, rather than the lesser-included conspiracy conviction should be vacated, Badalamenti cites *United States v. Rosa*,[107] in which the Third Circuit held that "[t]he district court has the discretion, when a defendant is convicted of duplicative offenses, to decide which conviction to vacate" and that "[i]t need not be the more serious one." [108]

Badalamenti's sentence based on the Section 846 conspiracy conviction was vacated on direct appeal prior to the Supreme Court's pronouncement in *Rutledge*.[109] It therefore would make little sense now to vacate his CCE conviction and sentence,[110] and Badalamenti has offered no persuasive reason for doing so. As the jury found Badalamenti guilty of both conspiracy and conducting a CCE, the Court holds that it is more appropriate to vacate the lesser included offense, the conspiracy conviction, in light of *Rutledge*.

## II. Claims of Salvatore Catalano, Giuseppe Lamberti, Salvatore Lamberti

Movants Salvatore Catalano, Giuseppe Lamberti and Salvatore Lamberti allege that their convictions were obtained by the government's use of perjured testimony from Tomasso Buscetta and Salvatore Contorno.

■■■ "Whether the introduction of perjured testimony requires a new trial depends on the materiality of the perjury to the jury's verdict and the extent to which the prosecution was aware of the perjury" at the time of trial.[111] If the defendant demonstrates that the prosecution knew or should · have known of the perjury, then the court will set aside the conviction " 'if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.' " [112] If, however, the government is not shown to have been aware of the perjury, a new trial is warranted only if (1) the testimony was material, and (2) " 'the court [is left] with a firm belief that but for the perjured testimony, the defendant would most

104. *Id.* at 1250–51, 116 S.Ct. 1241.

105. *See, e.g., United States v. Rosario*, 111 F.3d 293 (2d Cir.), *cert. denied,* ── U.S. ──, 118 S.Ct. 319, 139 L.Ed.2d 246 (1997).

106. Section 2255, which provides for challenge to a conviction on the grounds that "the sentence was imposed in violation of the Constitution or the laws of the United States ... or that the sentence was in excess of the maximum authorized by law," is an appropriate vehicle for attacking convictions on both conspiracy and CCE in light of *Rutledge. See, e.g., Yu v. United States,* No. 97 Civ. 2816(RWS), 1998 WL 160964, at \*3–4 (S.D.N.Y. Apr. 7, 1998) (analyzing Section 2255 claim based on *Rutledge* and finding the holding of *Rutledge* substantive, not procedural, and therefore applicable retroactively).

107. 103 F.3d 114, 1996 WL 713573 (3d Cir. Nov. 13, 1996).

108. *Id.,* 1996 WL 713573, slip op. at 7; *accord United States v. Baylor,* 97 F.3d 542, 548 (D.C.Cir.1996).

109. *United States v. Badalamenti,* 47 F.3d 72 (2d Cir.1995).

110. *Accord, United States v. Miller,* 116 F.3d 641, 678 (2d Cir.1997) (holding that the narcotics conspiracy conviction should be vacated, while the greater CCE offense should remain intact), *cert. denied,* ── U.S ──, 118 S.Ct. 2063, 141 L.Ed.2d 140 (1998); *Fisher v. United States,* No. 97 Civ. 3250(RWS), 1998 WL 283346, at \*5 (S.D.N.Y. June 1, 1998) (finding no legitimate support for vacating the greater, rather than lesser included, offense).

111. *United States v. Wallach,* 935 F.2d 445, 456 (2d Cir.1991).

112. *Id.* (quoting *United States v. Agurs,* 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)); *see also United States v. Helmsley,* 985 F.2d 1202, 1205–06 (2d Cir.1993).

likely not have been convicted.' " [113] Thus, the Court must determine whether there was false testimony, whether the government knew or should have known of its falsity, and, finally, how material the perjury was to the movants' convictions.

## A. *Allegedly Perjured Testimony*

Buscetta testified at the Pizza Connection trial primarily as to the structure of the Sicilian mafia and La Cosa Nostra in the United States. He identified several defendants, including Badalamenti and Salvatore Lamberti, as members of the Sicilian mafia.[114] Buscetta was questioned also about the narcotics trafficking activities of himself, Stefano Bontate, and Badalamenti. He testified that once he had been present while others discussed drug trafficking and in another instance he had introduced two "men of honor" for the purpose of conducting a drug transaction.[115] Other than these two instances, Buscetta testified that he had "never been involved in drug or narcotic trafficking." [116] Buscetta testified that Bontate "was against drug trafficking." [117] As outlined previously, Buscetta stated that Badalamenti "did not deal in drugs." [118]

Salvatore Contorno's testimony centered on a shipment of 40.6 kilograms of heroin. He stated that in February or March of 1980, a member of his mafia family asked him to go along to test a heroin shipment at an iron warehouse in Bagheria, Sicily.[119] Once there, Contorno testified that he was told that the testing would take place at a nearby farmhouse to which he and his companion

promptly proceeded. At the farmhouse, Contorno claimed, he met Catalano, Giuseppe Ganci—both of whom he had met earlier as "men of honor"—as well as several other Badalamenti defendants, none of whom is currently before the Court.[120] Together the group tested the heroin shipment. Although Contorno confessed to his own presence at the Bagheria farmhouse, he denied any participation in that heroin shipment because, he said, he lacked the funds.[121] The shipment of heroin subsequently was seized hidden in a box addressed to an Italian record store in Brooklyn.[122]

Later in his testimony, Salvatore Contorno denied participation in heroin trade in general due to his limited economic resources, although he admitted having been charged with drug trafficking in the past.[123] He testified that Bontate also was not involved in narcotics trafficking.[124] Finally, Contorno testified that he had committed only one violent act in his life, a shooting in self-defense.[125]

The testimony of Buscetta and Contorno since has been shown to have been false on a number of key points. As the government conceded, Buscetta appears to have had a much more extensive involvement in the narcotics trafficking business than he acknowledged at the Pizza Connection trial. Testimony from both government witness Francesco Marino Mannoia and from Buscetta himself in the trial of *United States v. Gambino* [126] confirm that both Bontate and Contorno also were heavily involved in the

113. *Wallach,* 935 F.2d at 456 (quoting *Sanders v. Sullivan,* 863 F.2d 218, 226 (2d Cir.1988)); *see also United States v. Seijo,* 514 F.2d 1357, 1364 (2d Cir.1975) (stating test as "whether there was a significant chance that this added item, developed by skilled counsel . . . could have induced a reasonable doubt in the minds of enough of the jurors to avoid a conviction.").

114. Tr. 548–49.

115. Tr. 1259, 1311–14, 1882–84.

116. Tr. 1314.

117. Tr. 1285.

118. *Id.*

119. Tr. 4387–92.

120. Tr. 4399, 4564–66, 4614–15.

121. Tr. 4391–92, 4540.

122. Tr. 3497–03, 3512–22, 3644–48, 3729, 4103–26, 6232–34.

123. Tr. 4630–31, 4801, 5837, 5845.

124. Tr. 5227.

125. Tr. 4867, 5198.

126. No. 88 Cr. 919(PKL).

narcotics trade.[127]

Furthermore, Mannoia testified in the *Gambino* trial that Contorno was heavily involved in narcotics trafficking and that, in fact, Mannoia had taught Contorno how to process morphine.[128] Mannoia stated also that he and Contorno reported directly to Bontate who was a principal in a heroin processing and trafficking operation that had been responsible for importing thousands of pounds of heroin to New York.[129]

Of the most significance is Mannoia's testimony that a great portion of Contorno's testimony regarding the Bagheria farmhouse heroin shipment was false. For example, Mannoia, who testified that he personally had refined much of the heroin in the 40 kilogram shipment, stated that he was not aware of any involvement of any of the defendants in this case in the 40 kilogram transaction [130] and that Contorno had an interest in the 40 kilogram shipment himself.[131] Another government witness in the *Gambino* trial, Francesco Rolli, testified that he helped to pack the 40 kilogram heroin shipment but was not "familiar with" Catalano.[132] Finally, several government witnesses in the *Gambino* trial provided evidence that, contrary to his earlier testimony, Contorno had been heavily involved in violent crime. For example, Mannoia testified that Contorno had been involved in four murders and one unsuccessful attempted murder.[133] Mutolo also testified that Contorno was involved in several killings.[134]

At the oral argument on these motions, the government conceded for purposes of these motions that Contorno's testimony was false in the areas in which it conflicted with Mann-

oia's testimony and with respect to Bontate.[135]

## B. *Government's Knowledge of the Perjury*

The government contends that it began to suspect that Buscetta had not been entirely truthful with regard to his own involvement in narcotics trafficking after Buscetta's testimony but during the government's case in the Pizza Connection trial. Consequently, the prosecutors involved in the case aver that they wrote a letter to defense counsel disclosing to them that there was evidence indicating that Buscetta had been untruthful and incomplete in his testimony regarding his own involvement in narcotics and inviting the defense counsel to recall him to the stand.[136] Affirmations from four of the *Badalamenti* prosecutors attest to the letter's existence,[137] and a colloquy in the trial transcript appears to refer to a letter from Assistant Martin which revealed that, contrary to Buscetta's testimony, he "was involved in drugs while he was in Brazil in 1982 and 1983." [138] On the other hand, defense counsel for six of the *Badalamenti* defendants deny ever having received such a letter.[139] The prosecutors, moreover, have been unable to locate a copy of the letter.

In any event, on March 30, 1994, the government sent a letter to counsel for a number of the defendants notifying them pursuant to *Brady v. Maryland* of the false testimony of Contorno.[140] The letter states that the perjury was not revealed until the *Gambino* trial in 1993. Subsequently, in October 1994, the government provided to defense counsel further elaboration on how

---

127. Gambino Tr. 810, 5240–42.

128. Gambino Tr. 810.

129. Gambino Tr. 306, 365, 380–84, 507–08, 810.

130. Gambino Tr. 841–43.

131. Gambino Tr. 421.

132. Gambino Tr. 1320–21.

133. March 3 Ltr. at 2.

134. Gambino Tr. 3623–26, 3644.

135. Tr., 2/10/98, 85–86.

136. Govt Opp. Br. to S. Lamberti at 17.

137. *See* Martin Aff.; McCarthy Aff.; Freeh Aff.; Bucknam Aff.

138. Tr. 26570–73.

139. *See* Schechter Aff.; DiChiara Aff.; Benfante Aff.; Kennedy Aff.; Schoenbach Aff.; Malerba Aff.

140. *See* Malerba & Cohen Decl. Ex. A.

it came to learn of the perjury.[141] In the October letter, the prosecutors recounted that they first began to learn of the Contorno perjury in interviews with Mannoia sometime prior to March 1990. After interviews with Mannoia revealed that Contorno might have been lying, Assistant U.S. Attorney Andrew McCarthy interviewed Contorno twice. He first met with Contorno in March 1990, during which time Contorno admitted that he had lied with respect to Bontate. McCarthy met with Contorno again at a later undisclosed date, but kept no notes from either of the two meetings.[142] Contorno fled the country shortly after the second meeting.

According to the October letter, the prosecutors then became involved in other matters, including the *Gambino* trial, and did not devote any more time or concern to the Contorno perjury. In late 1993, during the course of preparing for the *Gambino* retrial, the prosecutors interviewed Mannoia more extensively with regard to the 40 kilogram transaction and other possibly perjured testimony by Contorno in an effort to head off what had been conflicting testimony with regard to Contorno at the first *Gambino* trial. According to the October letter, these interviews and further government investigation resulted ultimately in the March 1994 letter.

The movants contend that the government knew or should have known of the perjurious testimony at the time of the Pizza Connection trial. They point out that Buscetta testified regarding Contorno and the mafia, of which Contorno was a member, and that the government therefore must have debriefed Buscetta and prepared him to testify concerning Contorno. Specifically, the movants argue that Buscetta's testimony that he had known Contorno since childhood and spent prison time with him, combined with the fact that Buscetta testified pursuant to a cooperation agreement which obligated him to tell the truth and must have resulted in a thorough debriefing and investigation prior to accepting his testimony, lead to the conclusion that the government must have known of Contor-

no's checkered past prior to 1990. Finally, the movants point out that the government never denied that it knew of the perjury and that it has failed to submit a sworn statement regarding Buscetta's interrogation.

## C. Requests for Discovery and Evidentiary Hearing

Based on their belief that the government was aware of the perjury, the movants have requested discovery or, in the alternative, an evidentiary hearing to explore when the government knew or should have known of the Buscetta and Contorno perjury. The movants cite Rule 6(a) of the Rules Governing Section 2255 Proceedings which permits discovery "if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise." They point also to *Bracy v. Gramley*[143] for the proposition that good cause may flow from reasonable inferences based on known facts. Because Buscetta was interrogated by the government before the *Badalamenti* trial, testified generally as to Contorno, knew Contorno from childhood and prison, and later admitted that Contorno was involved in drugs, the movants suggest that the Court infer that the government must have asked Buscetta about Contorno and Buscetta must have either revealed Contorno's past or lied to the government.

The movants' argument that the government knew or should have known thus is limited to the points on which Buscetta later testified. They have not suggested that the government knew or had any reason to know of the falsity of Contorno's testimony as to the Bagheria 40 kilogram shipment or as to his own record of violence. Discovery or a hearing necessarily would be limited accordingly to the narrow question of whether the government knew that Buscetta believed that Contorno had been involved in drugs. The Court finds, however, that discovery or an evidentiary hearing is not warranted where, as here, even assuming that the government knew at the time that Buscetta believed Con-

141. *Id.* Ex. B.

142. *Id.*

143. 520 U.S. 899, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1997).

torno was involved in drugs, there is "no reasonable likelihood that the false testimony could have affected the judgment of the jury."[144] As to the other perjured testimony regarding Bagheria and Contorno's history of violence, the Court is firmly convinced that the testimony was not material and that the defendants most assuredly would have been convicted even without the perjured testimony.[145]

### D. Salvatore Catalano

■ Even apart from the Contorno testimony regarding the Bagheria farmhouse shipment, the government presented considerable evidence implicating Catalano in narcotics trafficking. For example, another government witness, Luigi Ronsisvalle, testified that Catalano was elevated in 1976 to the position known as "Boss of Knickerbocker Avenue" from his previous role as a captain in the Bonanno family.[146] From this position, Catalano managed a "Sicilian pipeline" of heroin.[147] Ronsisvalle testified that he personally worked from 1976 to 1977 as a heroin courier for Felice Puma, one of Catalano's soldiers.[148] He stopped working regularly for a period of time in the spring of 1977 because Puma said he did not yet have work for him. One day, Ronsisvalle said, he arrived at Caffe Scoppello and saw Puma with Catalano and a third gentleman, but that Puma told him he would talk to him later.[149] That night, Puma told Ronsisvalle that there would soon be a heroin "pipeline" coming from Sicily.[150] Shortly thereafter, at the direction of Puma, Ronsisvalle began transporting large quantities of heroin from New York to Chicago[151] and Los Angeles[152] and from Miami to New York.[153]

On one such occasion in January 1978, Ronsisvalle was directed to meet Puma in Miami.[154] Puma arrived at the appointed spot at the appropriate time in a red sports car full of heroin, told Ronsisvalle that they were driving to Brooklyn, and handed him a .38 caliber pistol.[155] The next day, they arrived at a corner near Caffe Scoppello where Catalano was awaiting their arrival.[156] According to Ronsisvalle, Puma got out of the car, spoke briefly with Catalano, and then returned to the car. Shortly thereafter, Mimmo Tartamella arrived and got into the car, Puma and Ronsisvalle got out, and Tartamella drove the car away.[157]

Salvatore Amendolito, another government witness, testified that from 1980 he was hired to transport $9 million in cash from pizza shop owners in New York to bank accounts in Switzerland without the knowledge of the IRS and without revealing the names of the pizza shop owners.[158] At one point, Amendolito was contacted by a man named "Sal," who asked to meet him on a deserted street corner in Queens. When Amendolito arrived, the man introduced himself as "Sal" and the man with him as "Vito."[159] "Sal" asked Amendolito to smuggle $1 million out of the country for him, and he wrote down a phone number at which he could be reached.[160] Although Amendolito could not

---

144. See Wallach, 935 F.2d at 456.

145. Id.

146. Tr. 7284. As one example of Catalano's power as head of the Bonanno family, Ronsisvalle testified that on two occasions, Ronsisvalle wanted to kill two individuals who had double-crossed or insulted him but that Catalano had intervened and forced Ronsisvalle to shake the men's hands. Tr. 7285–91, 7296–7304, 7305–08, 7405–09.

147. Tr. 7183.

148. Tr. 7174–82.

149. Tr. 7180–81.

150. Tr. 7183.

151. Tr. 7191.

152. Tr. 7194.

153. Tr. 7203–04.

154. Tr. 7204.

155. Tr. 7204–08.

156. Tr. 7209.

157. Tr. 7209–13.

158. Tr. 9026–35.

159. Tr. 9198–9203.

160. Tr. 9205.

identify Catalano at trial as the "Sal" from the meeting, the slip of paper that "Sal" gave to him contained Catalano's thumb print and handwriting and the phone number then was subscribed by a hairdressing business owned by Vito Catalano, Catalano's brother.[161] Several days later, Catalano delivered $1.54 million in small bills in a suitcase to Amendolito.[162]

Additional evidence against Catalano included numerous instances of police surveillance capturing Catalano interacting with others proven to have been involved in the Pizza Connection conspiracy. For example, when Giuseppe Ganci went to get a half kilogram of heroin to sell to undercover DEA agent Stephen Hopson, he stopped for two hours at Catalano's house [163] and later met with Catalano at Catalano's bakery before retrieving the heroin and delivering it to Hopson.[164] According to surveillance reports, Ganci met with Catalano also before transferring money to Casamento in August 1983.[165] Similarly, physical surveillance captured Catalano at Café Aiello shortly before Ganci left carrying a white package.[166] Other cash exchanges occurred in Catalano's presence.[167] And Catalano was witnessed at numerous meetings with other defendants right around the time when intercepted phone calls revealed discussions about the "shirts," "furniture," and other code words for drugs and cash.[168]

In sum, there was an abundance of independent evidence against Catalano that persuades the Court that Catalano still would have been convicted even in the absence of Contorno's perjured testimony. The evidence of the transaction at Bagheria was not material to the case against Catalano, nor would additional impeachment evidence have been material to undermining Contorno's credibility. Contorno was impeached on several narcotics and smuggling counts, and he admitted having been charged with kidnaping and murder. Further evidence of his violent tendencies would have been cumulative and immaterial.[169]

### E. Giuseppe Lamberti

■ Like Salvatore Catalano, Giuseppe Lamberti contends that his conviction should be vacated because the government obtained it through the use of the perjured testimony of Salvatore Contorno and Tomasso Buscetta. Unlike Catalano, however, the government's evidence against Giuseppe Lamberti did not come from the testimony of either Contorno or Buscetta. In fact, neither Contorno or Buscetta mentioned Giuseppe Lamberti at all. Nor can Giuseppe Lamberti point to any inferences that may have been drawn against him from the testimony of Buscetta or Contorno. Instead, his motion appears to be a thinly veiled effort to piggyback on the claims of Salvatore Catalano, his one-time boss.

Even had testimony elicited from Contorno and Buscetta touched on Giuseppe Lamberti's role in the narcotics trafficking conspiracy, however, the evidence against him was so overwhelming that there is there no reasonable likelihood that the false testimony of Buscetta and Contorno affected the judgment of the jury. The government established that Giuseppe Lamberti was one of Catalano's chief lieutenants and that he was

**161.** Tr. 10594–608 (thumbprint), 10730–34 (handwriting), 11134, 11573 (phone number).

**162.** Tr. 9219–24, 10527.

**163.** Tr. 17673–77.

**164.** Tr. 18186–87, 18189; see also Tr. 18039–42, 18047–69 (detailing other meetings with Catalano in connection with Ganci's sales to Agent Hopson).

**165.** Tr. 18376–82.

**166.** Tr. 19498–501; 19505–07; Gov App. Br. 84–88.

**167.** Tr. 21897–909, 22223–26, 22426–40.

**168.** See, e.g., Gov.App. Br. 71–72, 81, 84–86, 99–100, 101, 105, 114–115, 119; 128–29; 139–40; 149; 157–50; GX 7904 ("samples of shirts," "cans," "samples"); GX 7916 ("shirts"); GX 7917 (same).

**169.** Cf. United States v. Amiel, 95 F.3d 135 (2d Cir.1996) ("Suppressed evidence is not material when it 'merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable.' ") (citing United States v. Wong, 78 F.3d 73, 79 (2d Cir. 1996)).

instrumental in importing the heroin into New York and disbursing it to distributors in New York, New Jersey and Pennsylvania. The evidence against Giuseppe Lamberti consisted almost entirely of physical surveillance and intercepted phone calls.

Without attempting to summarize the wealth of evidence against Giuseppe Lamberti, the Court notes that the government introduced into evidence at least 70 transcripts documenting his conversations with other defendants regarding narcotics importation and sales.[170] For example, on intercepted phone calls among the alleged conspirators, Giuseppe Lamberti was heard discussing *inter alia* transport of "tomatoes,"[171] "paint,"[172] and trucks of "snow."[173] In one of numerous police surveillances, Giuseppe Lamberti was seen meeting with Ganci, Mazzurco, and Zito at Ganci's home in Queens shortly before Zito brought in money from undercover agent Hopson for the purchase of ½ kilogram of heroin.[174] The next day, Zito informed Hopson that he had met with his associates at the home of his supplier and discussed Hopson's proposed importation of heroin from Bangkok.[175] Zito told Hopson also that his associates owned a demolition company in New York where they could dismantle the vehicle and store the heroin.[176] Pronto Demolition, in Brooklyn, then was owned by Giuseppe Lamberti, Ganci, and a few others.[177]

Another example of independent circumstantial evidence against Giuseppe Lamberti was his passport. The passport reflected two three-day trips to Brazil during the time that Badalamenti was there as a fugitive.[178]

As Giuseppe Lamberti has not made even a facial showing that the perjured testimony of Buscetta and Contorno touched on him at all and as the persuasive and overwhelming independent evidence against him conclusively demonstrated his guilt, his motion to vacate his conviction is denied.

## F. *Salvatore Lamberti*

 Salvatore Lamberti complains *pro se* that his conviction should be vacated because it was obtained through the government's use of perjured testimony by Buscetta.[179] In particular, Salvatore Lamberti complains that Buscetta testified falsely regarding his own involvement in narcotics trafficking, the narcotics trafficking of Stefano Bontate and Gaetano Badalamenti, and Lamberti's membership in the Sicilian mafia.

Buscetta's statement that Salvatore Lamberti was a member of the mafia is the only allegedly perjured testimony directly relating to him of which he complains. Lamberti, however, has offered no evidence that this testimony was false or that the government was aware of its falsity. Salvatore Lamberti's claim therefore must fail unless he can demonstrate that the testimony of Buscetta and Contorno which has been conceded by the government to be false was material to his conviction and that he most likely would not have been convicted but for the perjured testimony. He can demonstrate neither.

Buscetta's testimony that neither he himself nor Bontate was involved in narcotics trafficking was not material to the conviction of Salvatore Lamberti in light of the overwhelming independent evidence against him, especially as no evidence that Salvatore Lam-

**170.** *See* Govt.App. Br. *passim.* Giuseppe Lamberti stipulated to the evidence against him as outlined in the government's brief on direct appeal. *See* Kogan Ltr. of 2/24/98, at 2.

**171.** GX 7518.

**172.** GX 7824.

**173.** GX 7817.

**174.** Gov.App. Br. 72.

**175.** Gov.App. Br. 72–73.

**176.** Gov.App. Br. 73–74.

**177.** Gov.App. Br. 74.

**178.** Tr. 24473–75, 24552–53, 27865–66.

**179.** Salvatore Lamberti's motion is based almost entirely on his allegations of perjury by Buscetta. In two passing references, however, he mentions the perjury of Contorno. *See* Salvatore Lamberti Motion at 20 & 24. Because Salvatore Lamberti, like Giuseppe Lamberti, has not demonstrated that Contorno's testimony even remotely implicated him, he may not be heard to argue that Contorno's perjury entitles him to a new trial.

berti was involved in narcotics trafficking came from Buscetta or Bontate. Like the case against Giuseppe Lamberti, the evidence demonstrating Salvatore Lamberti's guilt of narcotics trafficking conspiracy was based almost entirely on physical surveillance and intercepted phone calls.

Again, without summarizing the abundance of evidence against Salvatore Lamberti, the Court notes that the government introduced at least 25 intercepted phone calls in which Salvatore Lamberti discussed narcotics transactions with his fellow co-defendants.[180] Illustrative of the type of evidence introduced against Salvatore Lamberti were two incidents involving his role in drug sales. At one point, undercover police surveillance captured Salvatore Lamberti delivered a blue box to Ganci at his home. Later, Zito delivered the blue box, with 78 percent pure heroin inside, to Agent Hopson.[181]

Similarly, on August 25, 1983, Salvatore Lamberti together with Mazzurco visited Ganci at his residence. While Salvatore Lamberti was getting out of the car, Mazzurco opened the trunk, got out a box, carried it to the garage and gave it to Ganci. About 30 minutes later, Mazzurco and Salvatore Lamberti exited the garage with Salvatore Lamberti carrying a white package.[182] Mazzurco returned to Ganci's house a few days later with a small package tucked into his shirt and later left the garage with a filled, white plastic bag with handles.[183] A few days later, Baldinucci went to Mazzurco's house and left with a brown paper bag. Baldinucci put the paper bag in his trunk and removed a brown shopping bag which he gave to Mazzurco. Baldinucci was arrested a short distance from Mazzurco's; the brown paper bag in the trunk had $40,000 in cash, and in Baldinucci's pocket was a sample quantity of 89.2 percent heroin.[184]

As none of the perjured testimony was material to the conviction of Salvatore Lamberti and as the independent evidence overwhelmingly demonstrates Salvatore Lamber-

ti's guilt of narcotics conspiracy, his motion to vacate his conviction is denied.

### Conclusion

The Court denies the motions of Salvatore Contorno, Giuseppe Lamberti, and Salvatore Lamberti in their entirety. The Court grants the motion of Gaetano Badalamenti to vacate his Section 846 conspiracy conviction and denies his motion in all other respects.

There having been no substantial showing of the denial of a constitutional right, the Court declines to issue a certificate of appealability and certifies that any appeal would not be taken in good faith within the meaning of 28 U.S.C. § 1915.

SO ORDERED.

---

180. *See* Govt.App. Br. *passim.*

181. Gov.App. Br. 72.

182. Tr. 18869–75.

183. Tr. 18929–35.

184. Tr. 18972–76; 18979–80; 19033–35; 19152.