Quanneil A. GIBSON, Appellant

v.

UNITED STATES, Appellee.

Nos. 98–CF–164, 98–CO–692.

District of Columbia Court of Appeals.

Argued March 30, 2000.
Decided March 7, 2002.

Christopher Warnock, Washington, DC, for appellant.

Alex J. Bourelly, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney at the time the brief was filed, and John R. Fisher, Elizabeth H. Danello, and Paul A. Quander, Assistant United States Attorneys, were on the brief, for appellee.

Before TERRY, FARRELL, and GLICKMAN, Associate Judges.

TERRY, Associate Judge.

After a ten-day trial, appellant was convicted of voluntary manslaughter while armed and possession of a prohibited weapon (PPW).[1] The court sentenced him to concurrent prison terms of fifteen years to life on the manslaughter conviction and one year on the PPW conviction. After he was sentenced and noted an appeal, appellant filed a motion to reduce his sentence under Super. Ct.Crim. R. 35 and a motion seeking recusal of the trial judge from consideration of the Rule 35 motion. Both of those motions were denied, and appellant noted a second appeal, which we consolidated with the first.

Before this court appellant asserts that there was insufficient evidence to convict him of voluntary manslaughter and that the verdict of one juror was the product of intimidation. In addition, he argues that the trial court abused its discretion by denying his motion for reduction of sentence and his motion for recusal. We hold that the evidence was sufficient and that the intimidation claim is without substance, but that the motion for recusal should have been granted. We therefore affirm the conviction on the merits, but remand the case for resentencing.

I

A. *The Government's Evidence*

On September 1, 1996, a fight erupted inside the Ibex night club on Georgia Avenue, Northwest. Present at the club, among others, were Tauhid Byrd, Darone Derricott, Austin Etheridge, and appellant. After being in the club for approximately a half-hour, Darone Derricott got into an

---

1. Appellant had been charged by indictment with first-degree murder while armed; he was found guilty of voluntary manslaughter while armed as a lesser included offense. The jury acquitted him of two counts of assault with intent to kill while armed, with which he had also been charged.

altercation with another man, and a fight ensued. The club's security guards, some of whom were off-duty police officers, intervened and escorted two groups of people, who appeared to be involved in the fight, out of the club through its front and rear exits. Byrd and Derricott were in the group that left by way of the rear exit, which led to a fire escape. At the bottom of the fire escape, Byrd and Derricott encountered some of the same people they had seen earlier inside the club, and another fight broke out.

At about the same time, Officer Warren Mayo of the Metropolitan Police was driving along Georgia Avenue in a police cruiser. He was stopped at an intersection, waiting for a traffic light to change, when he heard the sound of loud voices coming from behind the Ibex night club. Officer Mayo pulled his car onto Colorado Avenue, the street in back of the club, and parked near the entrance to the club's parking lot. He then noticed a group of about five men talking loudly at the top of the fire escape and got out of his car to investigate.

Officer Mayo walked underneath the fire escape and shined his flashlight toward the top of the stairs. When the men on the stairs did not respond, the officer went back to his car to wait and "monitor the situation." A few minutes later the men came down from the fire escape into the parking lot, where Officer Mayo heard one of them say, "There's one of those [men] [2] right there." The group then ran behind the police car and "began to attack what [Mayo] perceived as a lone male" who was lying on the ground. Officer Mayo picked up his baton and got out of the car, and as he did so, he saw appellant wildly swinging a knife at the group attacking the man on

the ground.[3] When they saw him wielding a knife, the other men began to run south on Colorado Avenue along the sidewalk. Appellant ran after them, "continuing to swing wildly, making striking motions toward the individuals," and Officer Mayo followed with his gun drawn. After a short distance, the men attempted to hurdle a parked car that was blocking their path. Four of them jumped over the car to safety, but the last man, Austin Etheridge, was caught by appellant, who proceeded to "stab him one time in the upper right portion of his back." Etheridge exclaimed, "You shanked me," and arched his back to the side.

After stabbing Etheridge, appellant stood with his arms at his sides and began to look around. Officer Mayo, who by now had caught up with appellant, ordered him to drop the knife, but appellant did not drop it and instead turned his back. The officer then heard the blade of the knife close, and appellant started to run away. Officer Mayo gave chase and again ordered him to drop the knife. At first he did not comply, but eventually he threw the knife between two parked cars as he continued to run. The officer reholstered his gun and grabbed appellant by his shirt collar, and appellant tripped and fell. Officer Mayo tackled him and radioed for assistance, noticing for the first time that appellant had a cut on his left arm. While the officer waited, some of the men that had been chased, including Etheridge— who by this time was showing signs of "distress"—approached appellant and began yelling at him. Because it was a "busy night," it took a few minutes for other officers and an ambulance to arrive, but once they got there, Mayo was able to

**2.** The word actually used was not "men" but an obscene epithet.

**3.** Officer Mayo testified that he was approximately twenty feet away from appellant and that the area was "well-lit, illuminated by an electric light."

retrieve the knife from the place where appellant had thrown it.[4]

Other witnesses provided further details of what happened both inside and outside the Ibex night club. Tauhid Byrd testified that he had gone to the Ibex that night with Darone Derricott, Bernard Derricott, and John Doswell after drinking and smoking marijuana. After they had been there for about a half-hour, Darone Derricott got into an argument with another man. Club security officers escorted the group out through the back door onto the fire escape. While the others argued with the security officers at the top of the fire escape, Byrd walked down to the bottom. There he saw "a group of guys" whom he had seen in the club earlier and said, "There they go." Another fight erupted between the two groups, during which appellant stabbed Byrd in the stomach. Bernard Derricott then drove Byrd to the Washington Hospital Center, where he remained for eight days.

Darone Derricott testified that while he and his friends were inside the Ibex night club, someone threw a drink in his face and punched him in the stomach. Derricott then left through the back door with four or five of his friends. Then, as he was walking down the fire escape, a fight broke out at the bottom of the stairs between Tauhid Byrd and another man. Derricott joined the brawl and started fighting with appellant because Byrd said that appellant had just stabbed him. After appellant also stabbed Derricott in the right arm, Derricott fled with Etheridge down Colorado Avenue, hurdling a parked

car to avoid being stabbed again. Derricott stated that appellant grabbed Etheridge as he was trying to climb over the car and stabbed him in the back.[5] After the police arrived on the scene, Derricott identified appellant to them as the man with the knife who had chased him and Etheridge down Colorado Avenue, and he also identified appellant in court.

The medical examiner testified that Austin Etheridge suffered a single stab wound to his right lung, and that he later died at a hospital from loss of blood.

## B. *The Defense Evidence*

Appellant's version of what happened was quite different. He testified that he had been pushed out the front door of the club by security guards after the fight broke out. Once outside, he and his friends began to walk to their car when he was jumped by a group of men who ran out of the alley. In the course of this melee, appellant said, he was stabbed and, believing that he "was going to die," picked up the knife from the ground "and just started swinging it." He then dropped the knife and ran down the street. The next thing he remembered was waking up on the hood of a car and again in the ambulance.

Brian Green and Terry Freeman, security guards at the Ibex, testified that they escorted the troublemakers out of the club. Green took one group out the back door onto the fire escape, and Freeman took the other group out the front door. As he stood on the fire escape with the men he had escorted there, Mr. Green saw some of

---

4. John Holzwart, a Metropolitan Police evidence technician who arrived a few minutes later, took several photographs of the scene and received the knife from Officer Mayo. Michael Smith, a fingerprint specialist with the Federal Bureau of Investigation, testified that a latent fingerprint matching appellant's

index finger was found on the blade of the knife.

5. On cross-examination, Derricott said that he did not actually see the stabbing, but that as he jumped over the car, he heard Etheridge yell, "He stabbed me."

the people who had left by the front door arrive in the area behind the club, and another fight broke out. Mr. Freeman testified that he "left everybody standing" out front as he ran to the back of the club to help break up the fight. There he saw some men beating another man on Colorado Avenue. As he came around the corner, the assailants fled, leaving two men lying in the street. Freeman also said that appellant was in the group he escorted out the front door and that "it was impossible" for appellant to have taken part in the fight in the rear of the club because "he was running down the steps with me."

Danika Washington, who had accompanied appellant to the club, testified that the security guards broke up the fight and that she, appellant, and a few others all left the club through the front door.[6] As they were heading to their car, they saw "a group of boys run from out the alleyway of the Ibex club." One of the men from the alley "jumped" Shawn Johnson and appellant. After this assault, Mr. Johnson was left lying unconscious in the street, and appellant was slumped over a car.

The jury found appellant guilty of voluntary manslaughter while armed and possession of a prohibited weapon. After the verdict was returned, the court polled the individual jurors, all of whom agreed with the verdict as announced by the jury foreman.[7]

### C. Post–Trial Motions and Sentencing

About a month after the trial, but before sentencing, appellant filed a "Motion to Set Aside the Verdict Based on Improperly Intimidating Influences at Polling," to which was attached a statement (erroneously captioned as an "affidavit") by juror Charles Hall. The motion and the written statement alleged that Mr. Hall had been intimidated in confirming the jury's guilty verdict during polling by Darone Derricott's presence in the courtroom. The motion also alleged that another juror, identified only as Ms. Scott, "felt 'trapped' into the guilty verdict" and did not dissent during the jury poll because "she feared she would be penalized by the court for changing her verdict." The government filed a response asserting that the trial judge had instructed the jurors that they could state "no" if they disagreed with the guilty verdict and that Mr. Derricott was not even in the courtroom during the poll.

When the case came on for sentencing, the court denied appellant's motion, ruling that the motion and Mr. Hall's written statement were "totally inadequate to justify attacking the verdict." With respect to juror Scott, the court noted that it had clearly "indicated that [Ms. Scott] had the ability to change the position she had agreed to back in the jury room." The court found Mr. Hall's claim of intimidation to be "totally absurd ... because, if he was so afraid of Mr. Derricott and he felt compelled to return a verdict of guilty because of Mr. Derricott, then why did he find Mr. Gibson not guilty of committing the assault against Mr. Derricott? That doesn't make sense.... I think [Mr. Hall's] statements are just totally inconsistent with the reality of what occurred in this case."

---

6. On cross-examination, Ms. Washington testified that she and her companions voluntarily left the club and were not escorted out by any security officers. Arleeta Thompson, who also witnessed the fight, corroborated Ms. Washington's testimony.

7. Because the trial judge was temporarily absent from the courthouse when the verdict was returned and the jury poll was conducted, another judge substituted for him and polled the jury in his absence.

The court then proceeded to impose sentence. After allowing appellant and his family members to speak, the court sentenced him to fifteen years to life, the maximum possible sentence, on the armed manslaughter conviction. In doing so, the court made the following comments:

> Sentencing is probably the most difficult thing that judges are asked to do. And it is sad and it hurts. And I don't know what, as a society, we do in order to turn that situation around. But it is sad when the number one cause of death for black men in this country between the ages of fifteen and twenty-four is homicide.... A black man in this society has a ... one in twenty-one chance of dying as a result of homicide before he reaches his thirtieth birthday.
>
> And on the one hand I am being asked to, in a sense, give a slap on the wrist, which obviously a fifteen-month sentence with probation, which is being asked by the defense—that's what this would be.
>
> I remember growing up and the hurt I always saw in my mother's eyes when she talked about her father. I never really understood the hurt that she felt until I got older and she told me that, you know, throughout her life she was denied an opportunity to have a father because someone decided to kill him and take his pay check.
>
> And everybody knew, she said, down in Georgia, who did it. But the life of a black man was thought to be not worth anything, and therefore, nobody was ever punished, and that has agonized my mother throughout her entire life.
>
> And I think all too often that has been the legacy of this country, that we do not respect the value of black life. And to impose a fifteen-month sentence for an offense that involved the stabbing of another human being in the back who, at the time he was stabbed, could not have been posing a threat to the defendant, I think would be saying to the Etheridge family and to the rest of society who care about people who are killed, that the life of black men is nothing.
>
> And I just can't buy in on that proposition.

Several weeks later, appellant filed a timely motion to reduce sentence pursuant to Super. Ct.Crim. R. 35. In a separate motion, appellant sought recusal of the trial judge from further proceedings in this case and asked that the motion to reduce sentence be assigned to another judge. In a written order, the trial judge denied both motions.

## II

■ Appellant asserts that the evidence was insufficient to convict him of voluntary manslaughter while armed. This court, of course, views the evidence "in the light most favorable to the government, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact...." *Curry v. United States,* 520 A.2d 255, 263 (D.C.1987); *accord, e.g., Nelson v. United States,* 601 A.2d 582, 593 (D.C. 1991) (citing cases). "The evidence may be deemed sufficient 'even if it does not exclude every reasonable hypothesis other than guilt.'" *Russell v. United States,* 701 A.2d 1093, 1098 (D.C.1997) (citation omitted); *see Owens v. United States,* 688 A.2d 399, 406–408 (D.C.1996) (Schwelb, J., concurring). "It is only where there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt that the trial court may properly take the case from the jury." *Williams v. United States,* 357 A.2d 865, 867 (D.C.1976) (citations omitted). Applying these familiar and oft-repeated stan-

dards of review, we hold that the evidence was sufficient.

Appellant's claim of insufficiency is essentially a challenge to the testimony of Officer Mayo, which he says was "flatly contradicted" by several other witnesses and was therefore not credible enough to permit the case to go to the jury. We strongly disagree. This court has often and consistently held that the testimony of a single witness is sufficient to sustain a criminal conviction, even when other witnesses may testify to the contrary. *See, e.g., Gethers v. United States,* 684 A.2d 1266, 1274 (D.C.1996), *cert. denied,* 520 U.S. 1180, 117 S.Ct. 1458, 137 L.Ed.2d 562 (1997); *Hill v. United States,* 541 A.2d 1285, 1287–1288 (D.C.1988).[8]

Viewed in the light most favorable to the government, the evidence showed that a brawl erupted between two groups of people inside the Ibex night club. Security officers intervened and escorted the two groups out of the club, one through the back door and the other through the front door. When some members of these groups encountered each other again outside behind the club, another fight ensued. Officer Mayo saw appellant, who was swinging a knife, chase some of the men involved in the fight down Colorado Avenue. As they all ran, Mayo saw appellant stab Mr. Etheridge in the back as Etheridge attempted to hurdle a parked car, and then saw appellant discard the knife, which the officer recovered a few minutes later. Appellant's fingerprint was later found on the blade of that very knife. In addition, Darone Derricott identified appellant as the man who chased him and Etheridge down Colorado Avenue. Although Derri-

cott did not actually see the stabbing, he testified that just as he jumped over the car that was blocking his and Etheridge's escape route, he heard Etheridge say, "He stabbed me." From Derricott's testimony, the jury could reasonably find that appellant, who was in close pursuit with a knife in his hand, and who moments earlier had stabbed Derricott in the arm, was the "he" to whom this statement referred.[9]

 Although appellant's account of the incident was very different, and although it was supported in various ways by the testimony of other witnesses, it cannot negate the eyewitness testimony of Officer Mayo and Darone Derricott. *See, e.g., Peterson v. United States,* 657 A.2d 756, 760 (D.C.1995). The jury heard their testimony as well as the testimony of nine defense witnesses, and ultimately it chose to credit the testimony of Mayo and Derricott, as it was entitled to do. This court recognizes "the jury's right to assess credibility and to draw reasonable inferences from the evidence it has heard." *Nelson,* 601 A.2d at 593. We have also made clear on many occasions that inconsistencies in the evidence affect only its weight, not its sufficiency, and are in any event for the jury to resolve. *See Dickerson v. United States,* 650 A.2d 680, 683 (D.C.1994); *Hill,* 541 A.2d at 1287; *Payne v. United States,* 516 A.2d 484, 495 (D.C.1986). We hold that a reasonable jury could find, from the evidence in the record, that appellant stabbed Mr. Etheridge in the back, that Etheridge died as a result of the stabbing, and that appellant was therefore guilty of voluntary manslaughter while armed.

---

8. The cases cited deal specifically with identification testimony by a single eyewitness, but the test for sufficiency is the same in all cases. *See In re R.H.M.,* 630 A.2d 705, 707 (D.C. 1993).

9. Officer Mayo had also heard Etheridge cry out, "You shanked [*i.e.,* stabbed] me."

## III

■ Appellant argues that the trial court abused its discretion by denying, without an evidentiary hearing, his motion to set aside the verdict on the ground that one juror, Mr. Hall, was improperly intimidated during the jury poll.[10] It has long been settled, however, "that a party cannot impeach a jury verdict by evidence given by the jurors." *Henderson v. District of Columbia,* 493 A.2d 982, 998 (D.C.1985) (citations omitted); *accord, e.g., Posner v. Holmes,* 739 A.2d 358, 364 (D.C.1999); *Sellars v. United States,* 401 A.2d 974, 981–982 (D.C.1979). "There are some exceptions to this rule, but 'a wide range of jury behavior still provides no valid basis for impeachment based upon the jurors' own evidence.'" *Posner,* 739 A.2d at 364 (citation omitted).

■ In the present case, to support his claim of jury impropriety, appellant offered a so-called "affidavit" from Mr. Hall which is more properly described as a written statement. An affidavit has been defined as "a voluntary declaration of facts written down *and sworn to by the declarant* before an officer authorized to administer oaths." BLACK'S LAW DICTIONARY 58 (7th ed.1999) (emphasis added). The statement at issue here was not under oath; hence it was not an affidavit. *Woldeamanuel v. Georgetown University Hospital,* 703 A.2d 1243, 1245 n. 4 (D.C.1997); *accord, e.g., Lamberti v. United States,* 22 F.Supp.2d 60, 71 n. 53 (S.D.N.Y.1998) (citing cases), *aff'd without opinion sub nom. Badalamenti v. United States,* 201 F.3d 430 (2d Cir.1999). At best, it was a hearsay statement from Mr. Hall, entitled to no greater consideration than any other unsworn hearsay statement.

In any event, Mr. Hall's statement alleged only that his failure to dissent from, or object to, the verdict during the polling "was influenced by certain extraneous facts ... the most notable of which is the intimidating presence throughout the trial of Darone Derricott." Mr. Hall did not say, or even suggest, that Mr. Derricott had said anything or made any threatening gesture toward him at any time, or even looked in his direction.[11] At the sentencing hearing, the trial judge pointed out these and other deficiencies and found Mr. Hall's claim of intimidation "totally absurd." In particular, the judge found that there were no "extraneous influences" on Mr. Hall and no "undue outside influences that impacted upon the deliberative process," which might (or might not) have warranted an evidentiary hearing. *See Sellars,* 401 A.2d at 981. Instead, what we have here is simply an allegation that Mr. Hall was somehow intimidated by Mr. Derricott's presence in the courtroom, which, even if true, would not entitle appellant to relief, or even an evidentiary hearing. *See Wilson v. United States,* 380 A.2d 1001, 1004 (D.C.1977) ("a juror may testify concerning the 'existence of any extraneous influence, although not as to how far that influence operated upon his mind'" (citation omitted)).

On the record before us, we can find no legal error and no abuse of discretion in the trial court's rejection of Mr. Hall's claim of intimidation. We see nothing that would justify a departure from the general rule reiterated in *Sellars,* and followed in

10. In his brief appellant has withdrawn any claim of error with regard to Ms. Scott, conceding that "the judge properly denied appellant's motion ... with regard to juror Scott." Thus our discussion will focus only on the allegations involving Mr. Hall.

11. Mr. Hall's statement made additional allegations about the conduct and opinions of some of the other jurors, but appellant does not rely on these allegations as a basis for reversal.

many other cases, that a juror cannot be heard to impeach his own verdict.[12]

## IV

■ Appellant also argues that the judge's repeated references, during the sentencing proceedings, to race and to his own grandfather's death were improper and require that he now be resentenced by another judge. While it is true that the trial judge mentioned race in the course of the sentencing proceedings, we do not agree that these remarks were improper or that the judge used race as a factor in determining what sentence to impose. It has long been settled that a trial judge, when imposing sentence, may consider a broad range of information, virtually unlimited as to its nature and the source from which it came. *E.g., Wasman v. United States*, 468 U.S. 559, 563, 104 S.Ct. 3217, 82 L.Ed.2d 424 (1984); *Roberts v. United States*, 445 U.S. 552, 556, 100 S.Ct. 1358, 63 L.Ed.2d 622 (1980); *Williams v. Oklahoma*, 358 U.S. 576, 584, 79 S.Ct. 421, 3 L.Ed.2d 516 (1959); *Williams v. New York*, 337 U.S. 241, 246, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949); *Powers v. United States*, 588 A.2d 1166, 1169 (D.C.1991); *Belton v. United States*, 581 A.2d 1205, 1213 (D.C.1990). In this case, the judge's reference to homicide statistics among young black men was made primarily in response to defense counsel's request for a probationary sentence. Appellant's emphasis here on the judge's "repeated and explicit" remarks about race falls short of establishing purposeful discrimination and provides no basis for reversal.

■ What is more troubling, however, is the judge's personal reference to the death of his grandfather. Canon 2(B) of the Code of Judicial Conduct for the District of Columbia Courts, which is applicable to judges of the Superior Court, provides in part that "[a] judge should not allow family, social, or other relationships to influence judicial conduct or judgment." It is well established that we need not find actual bias or prejudice in order to find a violation of the Canons; rather, we need only conclude that the facts "might reasonably cause an objective observer to question [the judge's] impartiality." *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 865, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988); *see Liteky v. United States*, 510 U.S. 540, 554, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994); *Scott v. United States*, 559 A.2d 745, 750 (1989) (en banc); *United States v. Heldt*, 215 U.S.App. D.C. 206, 239, 668 F.2d 1238, 1272 (1981), *cert. denied*, 456 U.S. 926, 102 S.Ct. 1971, 72 L.Ed.2d 440 (1982).

> Thus, even if there is no bias in fact, an appearance of bias or prejudice requires recusal if it is sufficient to raise a question in the mind of "the average citizen" about the judge's impartiality.

*York v. United States*, 785 A.2d 651, 655 (D.C.2001) (citations omitted). To be disqualifying, "the alleged bias and prejudice 'must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case.'" *Burt v. First American Bank*, 490 A.2d 182, 188 (D.C.1985) (citation omitted).

■ A claim of judicial bias based on appearances is unquestionably a difficult matter on which reasonable people can harbor differing views. In general, so long

---

**12.** The fact that the jury poll was conducted by a substitute judge, rather than the judge who presided over the trial, does not affect our decision. The issue before us here is a pure question of law, namely, whether appellant's motion, together with Mr. Hall's statement, was legally sufficient to require anything more than the summary denial which it received. For the reasons stated, we hold that it was not.

as a judge remains open-minded enough to refrain from deciding a case or ruling on a matter until all the evidence has been presented and all the parties allowed to state their positions, any comments the judge makes during the course of the proceedings will not be regarded as a sign of disqualifying bias or prejudice. *See* 46 Am.Jur.2d *Judges* § 170 (1994). If we were to hold otherwise, a judge could be disqualified for bias after making almost any negative comment or ruling during a trial, and there would be virtually no limit to disqualification motions under Super. Ct. Civ. R. 63–I(b). Thus the courts have held that what a judge learns in his or her judicial capacity is a proper basis for judicial comment, and the judge's use of such information should not lead to disqualification.

When a judge's remarks, however, are so unusual that a reasonable person could infer that the judge's decision has been predetermined or adversely affected by personal experiences, a reviewing court will often find a disqualifying appearance of bias, even if the judge is not in fact biased. *See Mitchell v. Maynard,* 80 F.3d 1433, 1450 (10th Cir.1996) (appearance of bias found after judge stated his view that plaintiff's claims were frivolous and "a waste of the jury's time"); *United States v. Antar,* 53 F.3d 568, 576–579 (3d Cir. 1995) (judge's comments during sentencing, that his goal "from day one" was to enforce a restitution order entered in a separate proceeding against defendant, gave rise to appearance of antagonism toward defendant, and judge should have recused himself *sua sponte*); *United States v. Torkington,* 874 F.2d 1441, 1447 (11th Cir.1989) (judge should have recused himself for "appearance of a lack of neutrality" after making comments that "questioned the wisdom of the substantive law he had to apply" and called the government's decision to prosecute "silly" and "a waste of the taxpayers' money"); *United States v. Holland,* 655 F.2d 44, 47 (5th Cir.1981) (judge's comments reflecting personal hostility toward defendant for successfully appealing prior conviction based on judge's actions required recusal).

In the case at bar, the trial judge specifically mentioned the death of his grandfather, the lifetime of pain it caused his mother, and the fact that "the life of a black man was thought to be not worth anything, and therefore, nobody was ever punished" for his murder. Before imposing sentence, he concluded, "All too often that has been the legacy of this country.... And I just can't buy in on that proposition." It is apparent—and quite understandable—that the judge had deep and powerful feelings about his grandfather's death and the effect that it had on his mother. We cannot and do not criticize him for having those feelings. Nevertheless, while we do not know exactly what was in the judge's mind at the time he made these particular comments, we are persuaded that an "objective observer"[13] might have difficulty understanding that the sentence was not influenced by the judge's emotions about the death of his grandfather. We have no reason to believe, and we do not believe, that the judge was in fact biased, but there is on this record an appearance of bias sufficient to require recusal under cases such as *Liljeberg* and *York.* Accordingly, we hold that appellant's sentence must be vacated and that he must be afforded a new sentencing hearing.

The judgment of conviction is therefore affirmed on the merits, but the sentence is

---

**13.** *Liljeberg,* 486 U.S. at 865, 108 S.Ct. 2194.

vacated, and the case is remanded for re-sentencing.[14]

*It is so ordered.*

---

**14.** Because the trial judge has recently retired and left the court, the sentencing will necessarily take place before a different judge.