*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

No. 22-CM-0778

MICKI LARSON-OLSON, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2021-CMD-000454)

(Hon. Michael O'Keefe, Trial Judge)

(Submitted October 18, 2023                           Decided February 22, 2024)

*Anne Keith Walton* was on the brief for appellant.

*Matthew M. Graves*, United States Attorney, and *Chrisellen R. Kolb*, *Nicholas P. Coleman*, *Marybeth Manfreda*, and *Brian M. Hanley*, Assistant United States Attorneys, were on the brief for appellee.

Before HOWARD and SHANKER, *Associate Judges*, and FISHER,[*] *Senior Judge*.

FISHER, *Senior Judge*: On January 6, 2021, while Congress was in session to certify the results of the 2020 presidential election, a large crowd of supporters of

---

[*] Associate Judge AliKhan was originally assigned to this case. Following her appointment to the United States District Court for the District of Columbia, effective December 12, 2023, Senior Judge Fisher has been assigned to take her place on the panel.

then-President Donald J. Trump broke through several layers of fencing to enter portions of the United States Capitol grounds that were closed to the public. Appellant/defendant Micki Larson-Olson was part of the crowd but testified at trial that she did not see any signs or fencing by the time she arrived. In the course of their efforts to disperse the crowd, law enforcement officers approached appellant and instructed her to leave multiple times, but she refused repeatedly and was eventually carried off of the scaffolding on which she stood. She was later charged with violating D.C. Code § 22-3302(b), which prohibits entering public property without lawful authority or refusing to leave on the demand of one lawfully in charge of that property.[1] *See Abney v. United States*, 616 A.2d 856, 858 (D.C. 1992). A jury convicted appellant, and Judge O'Keefe sentenced her to 180 days of

---

[1] D.C. Code § 22-3302(b) provides in full:

> Any person who, without lawful authority, shall enter, or attempt to enter, any public building, or other property, or part of such building, or other property, against the will of the lawful occupant or of the person lawfully in charge thereof or his or her agent, or being therein or thereon, without lawful authority to remain therein or thereon shall refuse to quit the same on the demand of the lawful occupant, or of the person lawfully in charge thereof or his or her agent, shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine of not more than the amount set forth in § 22-3571.01, imprisonment for not more than 6 months, or both.

incarceration. On appeal, she argues: (1) that the evidence was insufficient for the jury to conclude that she lacked a bona fide belief in her right to be on the premises, and (2) that the trial judge's comments at sentencing created an appearance of bias, warranting reversal of her conviction on due process grounds. We disagree and affirm appellant's conviction.

## I.  Factual and Procedural Background

The evidence presented at trial included the following: on January 6, 2021, Congress held a joint session at the Capitol for the purpose of certifying the results of the presidential election. In order to protect the joint session, significant portions of the Capitol grounds were closed to the public that day. The United States Capitol Police ("USCP") built a multi-layer security perimeter around the Capitol comprised of bike racks (thick metal barriers) and snow fencing (a "mesh-type fencing" often placed behind bike racks to provide additional reinforcement and keep them from separating). They also posted approximately 500 signs on the fencing stating something to the effect of "[a]rea closed by order of the United States Capitol Police Force." The USCP increased its security presence in and around the Capitol, and units of the Metropolitan Police Department ("MPD") were staged nearby. MPD officers had the same authority as USCP officers to make arrests or to remove people from the Capitol grounds.

Of particular concern to law enforcement was an event referred to as the "stop the steal" rally occurring in the Ellipse Park near the White House. Appellant attended that rally because she believed that the 2020 election had been stolen (i.e., that President Trump had received more electoral college votes than his opponent but had been denied victory through an illicit vote-switching scheme). President Trump spoke at the rally sometime after noon. Appellant testified that President Trump instructed the crowd "to peacefully go down to the Capitol[.]" A large group of supporters, including appellant, walked toward the Capitol.

The demonstration got out of control shortly thereafter. Around 1:00 p.m., the crowd broke through the bike rack barriers and nearby MPD units were called in for assistance.[2] Appellant testified that, by the time she arrived at the Capitol, she did not see any bike racks or snow fencing. She stayed on the grass at first but decided at some point to ascend the stairs on scaffolding, which was being constructed in the lower west terrace area by the Capitol building to support the stage for the upcoming presidential inauguration. She testified that she saw no signs or bike racks as she made the climb and that there were no officers on or immediately around the scaffolding to try to stop her. However, other testimony indicated that

---

[2] Around 2:00 p.m., the Capitol building itself was breached, resulting in an interruption to the Congressional proceedings. There is no evidence that appellant ever entered the building.

one would have had to pass through at least three layers of security on the grounds in order to reach the scaffolding.

MPD officers first encountered appellant around 5:00 p.m. on an upper level of the scaffolding, waving two large flags and wearing a red, white, and blue spandex costume that officers described as a "Captain America" outfit. By that point, law enforcement officers were actively dispersing the crowd around the Capitol and most people near appellant had left the scaffolding. The officers approached appellant and directed her to leave several times. She refused and insisted repeatedly that she was "not going anywhere."

When verbal commands did not work, several MPD officers then physically removed appellant. She resisted and shouted at the officers, wrapping her legs around the scaffolding to prevent being moved. It took a total of six officers to carry her down three to four flights of stairs as she continued to grab at various handholds to impede their progress. As they carried her, the MPD officers continued to ask her to get up and leave on her own, to no avail. She was carried outside a police line and handed off to officers who were to escort her off of the Capitol grounds. She was not arrested that day only because it "would have taken an officer off the street for multiple hours to process that arrest" and law enforcement did not have "the manpower" to make arrests while clearing the Capitol grounds.

Afterwards, appellant changed her profile picture on Facebook to an image showing her on the scaffolding outside of the Capitol, waving two flags and wearing her costume. She also posted a message on her Facebook profile stating that she had shown her flags from a "balcony" and "got carried down many flights of stairs by cops after getting tear gassed." When contacted by an agent of the Criminal Investigations Unit of the United States Attorney's Office several days later, appellant admitted that she had climbed the scaffolding, but insisted that no police officers had attempted to stop her. However, she also admitted that it had taken six officers to remove her.

Appellant was charged with unlawful entry on public property in violation of D.C. Code § 22-3302(b). In a two-day jury trial in September 2022, jurors heard testimony from multiple law enforcement officers and from appellant, and also viewed video footage taken from body-worn cameras of officers' efforts to remove appellant from the scaffolding. Appellant testified that she believed she had a right to be at the Capitol and on the scaffolding, but also admitted that police officers had instructed her to leave. She claimed that the officers "had no authority" over her because they were agents of what she believed to be an illegitimate government.[3]

---

[3] Appellant testified to her belief that the police officers ordering her to leave were employed by "the United States corporation, . . . not the United States for America republic[,] . . . because our nation was hijacked in 1871, and we were made a corporation." She added that we have "been under admiralty law ever since

At the close of evidence, Judge O'Keefe instructed the jurors that there were two different ways in which the government could prove the offense charged: (1) entry without authority or, (2) remaining without authority. He also instructed them that, in order to convict, they had to be convinced beyond a reasonable doubt that appellant did not have a good-faith belief of her lawful authority to enter or to remain in the area after being directed to leave. The jury returned a unanimous guilty verdict. Answering special interrogatories on the verdict form, the jurors unanimously found both: (1) that appellant entered public property without authority, and (2) that she remained on the premises of public property without authority.

Judge O'Keefe held a sentencing hearing the next day. The government requested a sentence of 180 days of incarceration, suspended as to all but 30 days, followed by 12 months of unsupervised probation. Appellant requested 30 days of incarceration, suspended in favor of six months of unsupervised probation. Defense counsel argued that this request was consistent with sentences of probation and house arrest that had been imposed in similar misdemeanor cases (prosecuted in federal court) arising from the events of January 6, 2021. In response, Judge O'Keefe asked if those defendants had gone to trial, and the prosecution represented

---

1871[,]" and that Ulysses S. Grant was the last president of the republic, until he went through the British crown to get a loan that had to be paid off in gold.

that they had not.  When defense counsel argued that appellant had not "den[ied] ever once on the stand that she didn't [sic] do what she did," the judge responded by asking "[t]hen why did she go to trial?  Why did she waste two days of people hav[ing] to take off of work?"  Defense counsel responded that "she wanted to have her right to go to trial and that's what she did."

After defense counsel's presentation, appellant spoke on her own behalf and told the judge, among other things, that the police had lacked jurisdiction over her, that her military oath had "morally and ethically" prevented her from complying with officers' orders to leave, and then repeated her claim that the officers were agents of a government with no authority over her.  *See supra* note 3.  In response, Judge O'Keefe said "I think you might be slightly delusional about some things, right?"  He acknowledged that appellant had acted on her sincerely held political beliefs but commented that "they're not grounded in any facts."  The judge added that appellant had her "belief of these various conspiracy things" and that it was "pointless . . . to argue" with her.

Judge O'Keefe explained that appellant was "clearly . . . not remorseful," contrasting her with defendants who "came in, took a plea, [and] said they were sorry[.]"  He then said:

> And instead of just coming in and accepting the responsibility for it, you wasted the time—it's not the Court because we're here every day to deal with folks and we give everybody who wants a trial, they can have a trial.

> But 14 citizens of the District of Columbia had to give up two days out of their personal lives, had to take off from work to come in and listen to this case which was a slam dunk.

For all these reasons, he concluded that appellant did not "get any credit for taking responsibility for [her] actions" and that probation was not an appropriate sentence.

The judge then imposed a sentence of 180 days of incarceration (none suspended), nearly the maximum term authorized by statute, and ordered appellant to pay a $50 assessment into the Crime Victims Compensation Fund.[4] Appellant noted a timely appeal of her conviction.

## II.    Discussion

### A.    Sufficiency of the Evidence

"In reviewing for sufficiency of evidence, we must sustain the conviction unless there is 'no evidence upon which a reasonable mind could fairly conclude

---

[4] While 180 days is the maximum sentence for a conviction under Subsection (a) of D.C. Code § 22-3302 (unlawful entry on private property), appellant was charged and convicted under Subsection (b) (public property), which authorizes a maximum sentence of six months. We have explained that six months "will amount to 181 to 184 days," *Turner v. Bayly*, 673 A.2d 596, 596-97 (D.C. 1996), and that Subsection (b) thus triggers the statutory right to a jury trial for offenses with a maximum penalty greater than 180 days provided for in D.C. Code § 16-705(b). *Frey v. United States*, 137 A.3d 1000, 1001 (D.C. 2016).

As for the assessment, $50 is the minimum amount the judge could have imposed in this case. *See* D.C. Code § 4-516(a) ("[A]n assessment of between $50 and $250 for other serious traffic or misdemeanor offenses . . . shall be imposed upon each person convicted . . . .").

guilt beyond a reasonable doubt.'" *High v. United States*, 128 A.3d 1017, 1020 (D.C. 2015) (quoting *Bolden v. United States*, 835 A.2d 532, 534 (D.C. 2003) (per curiam)).  We view the evidence in the light most favorable to the government, and the "[a]ppellant bears a heavy burden to convince the court to reverse a conviction on sufficiency grounds." *Hughes v. United States*, 150 A.3d 289, 305 (D.C. 2016). Appellant has not met that burden here.

The jury found appellant guilty of violating D.C. Code § 22-3302, which "prohibits the act of entering or remaining upon any property when such conduct is both without legal authority and against the expressed will of the person lawfully in charge of the premises." *Ortberg v. United States*, 81 A.3d 303, 305 (D.C. 2013) (quoting *Leiss v. United States*, 364 A.2d 803, 806 (D.C. 1976)).  As explained above, the jury convicted appellant on two distinct theories: (1) that she unlawfully entered the Capitol grounds and (2) that she remained without authority after being ordered to leave by law enforcement officers.

With respect to private property, "[t]he mere demand of the person lawfully in charge to leave necessarily deprives the other party of any lawful authority to remain on the premises." *O'Brien v. United States*, 444 A.2d 946, 948 (D.C. 1982). In cases involving public property under Subsection 22-3302(b), however, remaining without authority requires the government to prove both "(1) that a person lawfully in charge of the premises expressly order[ed] the party to leave, and (2) that,

in addition to and independent of the evictor's wishes, there exist[ed] some additional specific factor establishing the party's lack of a legal right to remain."[5] *Id.*; *Carson v. United States*, 419 A.2d 996, 998 (D.C. 1980). "Such factors may consist of posted regulations, signs or fences and barricades regulating the public's use of government property, or other reasonable restrictions." *Carson*, 419 A.2d at 998. This additional requirement for public property protects First Amendment interests by ensuring that "an individual's otherwise lawful presence is not conditioned upon the mere whim of a public official." *Id.* (quoting *Leiss*, 364 A.2d at 806).

Under either an unlawful entry or a remaining without authority theory, the government is required to prove that the defendant either knew or should have known that her entry or continued presence was unwanted. *See Ortberg*, 81 A.3d at 308 ("[I]t is sufficient for the government to establish that the defendant knew or should have known that his entry was unwanted."); Criminal Jury Instructions for the District of Columbia, No. 5.401(A-B) (5th ed. 2023) ("[The defendant] knew or should have known that s/he was entering against that person's will"; "S/he knew or should have known that s/he was remaining on the property against the will of . . .

---

[5] The statute was divided into two subsections to differentiate between private and public property in 2009, *see Ortberg*, 81 A.3d at 306 n.3, but our case law recognized this distinction prior to that amendment. *See, e.g.*, *O'Brien*, 444 A.2d at 948.

the person lawfully in charge of the premises.").[6]  Accordingly, a defendant has a valid defense if she entered or remained with a bona fide belief in her right to do so. *See Ortberg*, 81 A.3d at 308-09.  However, to support this bona fide belief defense, the belief must not only be "based in the pure indicia of innocence," *id.* at 309 (quoting *Gaetano v. United States*, 406 A.2d 1291, 1294 (D.C. 1979)), "but also must be reasonably held." *Id.*

Appellant's challenge to the sufficiency of the evidence focuses solely on the jury's rejection of her bona fide belief defense.  She first argues that the evidence undercut the jury's conclusion that she lacked a good-faith belief that she was allowed to enter the Capitol grounds and climb the scaffolding.  She relies on her own testimony and statements to law enforcement that no one tried to stop her, the testimony of several officers regarding the lack of bike racks and snow fencing directly blocking access to the scaffolding, and the fact that other people were already present on the scaffolding when she climbed it.

---

[6] In *Wicks v. United States*, 226 A.3d 743, 749-50 (D.C. 2020), we questioned in dictum whether the "should-have-known" standard is consistent with the "new approach for categorizing mens rea" articulated in our en banc decision in *Carrell v. United States*, 165 A.3d 314 (D.C. 2017) (en banc).  However, we resolved *Wicks* without deciding that question.  *Wicks*, 226 A.3d at 750.  The standard jury instruction was given without objection in this case and has not been challenged on appeal.  Moreover, appellant has not asserted that she did not know she had been ordered to leave.  As we explain below, she testified that she heard those orders, but proudly defied them.

There is evidence in the record to suggest that the crowd might have knocked down some of the barriers and overwhelmed law enforcement officers to the point that there was little left standing in appellant's way by the time she entered the Capitol grounds and ascended the scaffolding. But appellant's argument on this point is directed almost entirely at the unlawful entry theory of conviction. Even assuming arguendo that the evidence was insufficient to convict her on the unlawful entry theory, there is ample evidence to support the jury's independently sufficient finding that appellant "remained on the premises of public property without authority[.]"

First, there is overwhelming evidence that appellant was inside an area that the USCP had closed to the public prior to the crowd's arrival. The jury heard testimony, including from appellant herself, that MPD officers repeatedly asked appellant to leave and that she refused and had to be removed by force.[7] For example, the following exchange occurred during her cross-examination at trial:

---

[7] Because the Capitol grounds are public property, it was the USCP's closure of the grounds generally, not MPD's specific instruction to leave, that established appellant's lack of a right to remain as a matter of law. *See Abney*, 616 A.2d at 859 (noting that an order by the Capitol Police Board was a sufficient independent factor establishing a prohibition against remaining in closed portions of the Capitol grounds). Appellant has not argued that the USCP's order or public notice thereof was deficient in any respect, or that the officers were required to explain the order to her when directing her to leave. We therefore have no occasion to consider those questions. *See, e.g.*, *Womack v. United States*, 673 A.2d 603, 613 (D.C. 1996) (declining to consider an issue not briefed on appeal).

Q: [Y]ou admit that officers told you to leave, right?

A: Yes, ma'am.

Q: And you admit that you didn't listen to those officers, right?

A: Oh, I listened to them. I just wasn't going to comply.

The jury also viewed body-worn camera footage of appellant refusing to leave, shouting at the officers, and struggling and resisting as they were forced to carry her down the stairs of the scaffolding.

Moreover, by the time appellant was ordered to leave, she would have seen that officers were actively working to clear the area, deploying tear gas and other conspicuous crowd-dispersal measures. Most other individuals near appellant left when those measures were deployed. Finally, the jury was free to reject appellant's assertion that—in her roughly three hours on the grounds—she did not notice multiple layers of bike racks, snow fencing, and signage that, even if knocked down or not otherwise directly obstructing her entry, would have given a reasonable person pause before disregarding an order to leave. In their totality, the circumstances provide more than sufficient evidence for the jury to infer that appellant could not have *reasonably* believed that she had a lawful right to remain in spite of the officers' instructions to the contrary.

Appellant's second argument is that, for various reasons—including that she is a military veteran and that President Trump had directed the crowd to go to the

Capitol—she believed that she "had a duty to the Constitution to not obey the police officers instructing her to leave." However, the bona-fide belief defense does not "exonerate individuals who believe they have a right, or even a duty, to violate the law in order to effect a moral, social, or political purpose, regardless of the genuineness of the belief or the popularity of the purpose." *Gaetano*, 406 A.2d at 1294; *see also Hemmati v. United States*, 564 A.2d 739, 745 (D.C. 1989) ("It is no defense to a charge of unlawful entry . . . that the crime was committed out of a sincere personal or political belief, however genuine, in the rightness of one's actions."). Likewise, "a mistaken belief in a constitutional law defense . . . will not support a *bona fide* defense theory." *Abney*, 616 A.2d at 863. Thus, appellant's political motives for violating the statute, as well as her belief that she was present on the Capitol grounds in furtherance of a constitutional duty, supply no basis to avoid criminal liability here.[8] Accordingly, we conclude that the jury's verdict was supported by sufficient evidence.

---

[8] Appellant testified that President Trump told his supporters "to peacefully go down to the Capitol[.]" It is far from clear that following this instruction required her to unlawfully enter, or remain on, the Capitol grounds. Even if it did, we do not understand appellant to be arguing that President Trump possessed the authority to suspend the criminal law, an argument that has been rejected in other prosecutions arising from the events of January 6, 2021. *See, e.g.*, *United States v. Chrestman*, 525 F. Supp. 3d 14, 32 (D.D.C. 2021) ("No American President holds the power to sanction unlawful actions because this would make a farce of the rule of law.").

### B.     The Claim of Judicial Bias

Appellant separately argues that Judge O'Keefe's comments at the sentencing hearing warrant reversal of her conviction.  We conclude that these statements do not give rise to an appearance of bias affecting her conviction.

Pursuant to the Code of Judicial Conduct for the District of Columbia Courts, a judge is required to "disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned."[9] *Tarrio v. United States*, 282 A.3d 86, 95 (D.C. 2022) (quoting Code of Judicial Conduct for the District of Columbia Courts R. 2.11(A)).  "'Recusal is required if an objective, disinterested observer *fully informed of the facts* underlying the grounds on which recusal was sought would entertain a significant doubt that justice would be done in the case,' i.e., if such an observer 'could reasonably doubt' the judge's impartiality."  *Id.* (emphasis in original) (quoting *In re M.C.*, 8 A.3d 1215, 1222 (D.C. 2010)).  "[W]hat a judge learns in his or her judicial capacity is a proper basis for judicial comment, and the judge's use of such information should not lead to disqualification."  *Gibson*

---

[9] While citing the applicable ethical rules, appellant also frames her judicial bias claim as implicating due process.  Due process, however, "demarks only the outer boundaries of judicial disqualifications."  *Williams v. Pennsylvania*, 579 U.S. 1, 13 (2016) (quoting *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 828 (1986)).  The Supreme Court has indicated that because the "appearance of impropriety" standard adopted by most states and the District "provide[s] more protection than due process requires, most disputes over disqualification will be resolved without resort to the Constitution."  *Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 888-90 (2009).

*v. United States*, 792 A.2d 1059, 1069 (D.C. 2002). A reviewing court may find a "disqualifying appearance of bias" in circumstances where "a judge's remarks . . . are so unusual that a reasonable person could infer that the judge's decision has been predetermined or adversely affected by personal experiences[.]" *Id.*

Appellant argues for the first time on appeal that Judge O'Keefe's statements at sentencing create the appearance of partiality and thus support her claim of disqualifying judicial bias.[10] In particular, she highlights the judge's repeated comments on her decision to proceed to trial despite the weight of the evidence against her, as well as his statement that some of her beliefs were "delusional" and "not grounded in any facts." She also argues that Judge O'Keefe's imposition of the near-maximum sentence shows that he "sought to punish [her] for what the judge personally considered to be 'delusional' political beliefs."

---

[10] We have "been somewhat wary about finding a waiver or forfeiture of a judicial disqualification claim from a litigant's silence alone, at least in circumstances where the objection would be tantamount to attacking the judge's integrity just before the judge was about to make a crucial discretionary ruling." *Plummer v. United States*, 43 A.3d 260, 269-70 (D.C. 2012); *see also Belton v. United States*, 581 A.2d 1205, 1212 (D.C. 1990) ("[I]t would be expecting too much to hold a defendant accountable for failing, in effect, to accuse a judge of bias at the hearing just before the discretionary, virtually non-reviewable act of sentencing takes place."). However, we need not decide the applicable standard of review because appellant's claim fails under either plain error or de novo review. *See In re D.M.*, 993 A.2d 535, 540 (D.C. 2010) (declining to resolve whether plain error review was appropriate where "there was no violation of the canons of judicial ethics, plain or otherwise").

Judge O'Keefe's statements do not entitle appellant to the relief she seeks. First, his comments must be understood in the context in which they were made. Judge O'Keefe was both explaining the rationale for the sentence imposed and responding to a specific argument made by defense counsel, that appellant's sentence should be lenient and comparable to sentences imposed in certain January 6 cases prosecuted in federal court. Underlying all of his statements was the stark absence of acceptance of responsibility from all of appellant's actions and statements to the court. As Judge O'Keefe concluded, appellant was not entitled to "any credit for taking responsibility for [her] actions" and he did not see "a point in putting somebody . . . on probation when they've already indicated they haven't learned anything and they don't intend on learning anything."

Acceptance of responsibility (or the absence thereof) is a legitimate consideration at sentencing, and, in making that determination, a trial judge may appropriately take into account whether or not a defendant pleaded guilty. *See Leander v. United States*, 65 A.3d 672, 676 (D.C. 2013) (explaining that "it is well established that a defendant may be given credit at sentencing for a guilty plea, particularly where the plea can be seen as indicating genuine acceptance of responsibility for the offense committed"). "Implicit in this authority to extend leniency to a defendant who pleads guilty must be the discretion to 'withhold[ ] leniency from others who appear less deserving.'" *Coles v. United States*, 682 A.2d

167, 169 (D.C. 1996) (alteration in original) (quoting *United States v. Jones*, 997 F.2d 1475, 1478 (D.C. Cir. 1993) (en banc)). Thus, it was not inappropriate for the judge to note appellant's decision to go to trial and to contrast it with cases in which other defendants "came in, took a plea, [and] said they were sorry[.]" While a judge "must take care how they articulate that principle in connection with any case," *Leander*, 65 A.3d at 676, and ought not to refer to a trial as a waste of the jurors' time, those comments at sentencing do not support a claim of judicial bias in this context. Likewise, comments on her beliefs were relevant to the issue of acceptance of responsibility given that, as the judge noted, those beliefs evidently fueled her refusal to acknowledge that she had done anything wrong.

Most importantly, we do not see how Judge O'Keefe's comments at sentencing could lead a reasonable, informed observer to doubt the integrity of the already-concluded merits phase of the trial. Judge O'Keefe was not the finder of fact, nor could any comments made at sentencing have influenced the jury's deliberations the day before.[11] For these reasons, we do not find appellant's reliance on *Mitchell v. Maynard*, 80 F.3d 1433 (10th Cir. 1996), to be persuasive. In *Mitchell*, the Tenth Circuit reversed in part a district judge's dismissal (for the second time)

---

[11] *See United States v. Edmond*, 52 F.3d 1080, 1101 (D.C. Cir. 1995) (per curiam) (explaining that "a judge's comments before the jury are subject to 'special scrutiny' on a claim of bias" (quoting *United States v. Dellinger*, 472 F.2d 340, 386 (7th Cir. 1972))).

of an incarcerated plaintiff's civil rights action, and concluded that "the interests of justice would be best served by remanding this case with instructions that a different judge be assigned." *Id.* at 1438, 1450. In making the determination that future proceedings should be assigned to a different judge, the court considered the "appearance of impropriety" standard used in judicial recusal cases. *Id.* at 1450. The court noted, among other things, that the judge had expressed his view that the plaintiff's claims were "frivolous" and a "waste of the jury's time." *Id*. Appellant seizes on the similarity of this language, taken out of context, to some of Judge O'Keefe's comments during the sentencing hearing. In *Mitchell*, however, those comments were made during the merits stage (during the plaintiff's testimony to the jury) and were part of a pervasive pattern of conduct throughout trial indicating the judge's hostility toward the incarcerated plaintiff and his attorney. *See id.* at 1448-50. That judge had ultimately granted judgment as a matter of law against the plaintiff prior to jury deliberation, thus ending the case himself. *Id.* at 1449. Here, by contrast, appellant's guilt was decided by a jury that could not have been influenced by the judge's comments.

Since the comments at issue were all made after the jury's verdict, appellant's argument would be better directed at a challenge to her sentence. The appropriate remedy for an appearance of impropriety affecting only a judge's sentencing decision would be vacatur of the sentence and a remand for resentencing before a

different judge. *See, e.g.*, *Gibson*, 792 A.2d at 1069-70, 1070 n.14 (remanding for resentencing where, in light of the judge's comments, an objective observer "might have difficulty understanding that the sentence was not influenced by the judge's emotions about the death of his grandfather"); *Belton v. United States*, 581 A.2d 1205, 1214-15 (D.C. 1990) (remanding based on an apparent impropriety raised by the judge's reference to ex parte communications about the case prior to sentencing). Here, the sole relief requested by appellant is reversal of her conviction. Presumably, this is because appellant has already served her 180-day sentence of incarceration in its entirety and was ordered to pay to the Crime Victims Compensation Fund only the minimum assessment ($50) required by statute. *See* D.C. Code § 4-516(a). Thus, resentencing would be futile and could afford no meaningful relief to appellant at this point in time.[12]

This is not to say that a judge's statements after a guilty verdict is rendered will never call the conviction into doubt. In *Mejia v. United States*, for example, we reversed the defendant's conviction at a bench trial based on the fact-finder's statement made after conviction but before sentencing. 916 A.2d 900, 902-03 (D.C. 2007). In *Mejia*, the judge's comments indicated that she may have harbored

---

[12] For the same reason (and because appellant has not raised this argument in her brief), we do not consider whether the judge impermissibly penalized appellant for exercising her right to a jury trial. *See Coles*, 682 A.2d at 169-70.

stereotypes about men from El Salvador relevant to the sexual offense for which she had just found a Salvadoran defendant guilty. *See id.* Under those particular circumstances, we held that "an appearance of bias to an informed, objective observer might exist, and the integrity of the judicial process [was] compromised." *Id.* at 903. Here, however, Judge O'Keefe was not the finder of fact, and appellant has not identified any comment or ruling during the trial that might have influenced the jury's evaluation of the evidence.

Finally, unlike *Mejia*, the comments at issue do not raise the appearance that the judge might have been influenced by any extrajudicial biases or stereotypes from the inception of the proceedings. Rather, his comments were based upon the evidence presented at trial, including appellant's own testimony and her statements at sentencing. As the United States Supreme Court has explained:

> The judge who presides at a trial may, upon completion of the evidence, be exceedingly ill disposed towards the defendant . . . . But the judge is not thereby recusable for bias or prejudice, since his knowledge and the opinion it produced were properly and necessarily acquired in the course of the proceedings[.]

*Liteky v. United States*, 510 U.S. 540, 550-51 (1994). While some of those comments were perhaps ill-advised, read in context, they reflect a trial judge's response to an unrepentant defendant's request for leniency, and fall far short of creating the appearance of "deep-seated . . . antagonism that would make fair

judgment impossible." *Id.* at 555. Accordingly, we reject appellant's claim of judicial bias.

### III. Conclusion

For the foregoing reasons, the judgment of the Superior Court is

*Affirmed*.